# United States Court of Appeals for the Eighth Circuit

**Continental Resources, Inc., an Oklahoma Corporation,**
*Plaintiff-Appellee,*

**v.**

**North Dakota Board of University and School of Lands,**
*Defendant-Appellee,*

**and**

**United States of America,**
*Defendant-Appellant.*

APPEAL FROM DECISION OF THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NORTH DAKOTA
(1:17-CV-14-DLH-CRH)

**NORTH DAKOTA BOARD OF UNIVERSITY AND SCHOOL LANDS'
APPELLEE BRIEF**

State of North Dakota
Drew H. Wrigley
Attorney General

By: Philip Axt (ND Bar No. 09585)
Solicitor General
Email: pjaxt@nd.gov

Charles Carvell (ND Bar No. 03560)
Special Assistant Attorney General
Email: cmc@pearce-durick.com

Office of Attorney General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210

Pearce Durick PLLC
314 E. Thayer Ave., PO Box 400
Bismarck, ND 58502
Telephone: (701) 223-2890

*Counsel for Defendant-Appellee*

## SUMMARY OF THE CASE

This is a choice-of-law dispute over whether State or Federal law demarcates the historic ordinary high water mark (OHWM) for portions of the Missouri River in North Dakota. The answer to that question determines whether the State or the Federal government should receive certain disputed oil and gas royalties.

In the 1950s, the Missouri River was dammed in North Dakota, creating the Lake Sakakawea reservoir. For the mineral royalties at issue, it is undisputed that the State owns the riverbed below the OHWM as it existed prior to the river being dammed and the Federal government owns the submerged lands above that historic OHWM. The question is simply where the line should be drawn—or, more precisely, what law decides where it will be drawn. Where to draw that line has become important in recent years because technological advances have allowed for the capture of previously unrecoverable oil and gas from beneath the riverbed.

But before the choice-of-law dispute can be reached, the United States' claim of sovereign immunity must be addressed. This action was brought as an interpleader by Continental Resources—an oil and gas operator—to determine whether it should pay certain disputed royalties to the Federal government or to the State. The United States, like North Dakota, claims an interest in the royalties. Nonetheless, the United States also claims immunity to this interpleader.

The State agrees with the U.S. that oral argument, with 20 minutes allotted to each side, would assist the Court in resolving the issues raised in this appeal.

Appellate Case: 23-2249    Page: 2    Date Filed: 11/08/2023 Entry ID: 5334182

TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iv

STATEMENT OF THE CASE ............................................................................... 1

I.    Background ....................................................................................... 1

II.   Procedural History .......................................................................... 7

SUMMARY OF ARGUMENT ............................................................................. 9

ARGUMENT ..................................................................................................... 12

I.    The United States Waived Sovereign Immunity for This
     Action. .......................................................................................... 12

       A.    A lien does not have to be past due to be a lien. .................... 13

       B.    Section 2410 is not limited to disputes about lien
           priority and exists alongside the Quiet Title Act. .............. 17

II.   For the Public Domain Lands, Federal Law Adopts State
     Law. .............................................................................................. 19

III.  For the Acquired Lands, State Law Governs. ................................ 28

       A.    State law applies in the first instance. ................................. 28

       B.    Alternatively, Federal law would adopt State law. ............ 33

       C.    State law means the State-commissioned Wenck
           Survey. ............................................................................... 37

CONCLUSION .................................................................................................. 39

Appellate Case: 23-2249    Page: 3    Date Filed: 11/08/2023 Entry ID: 5334182

**Page(s)**

**Cases**

*Beers v. Arkansas*,
  61 U.S. (20 How.) 527 (1857) ........................................................... 16

*Best v. Humboldt Placer Min. Co.*,
  371 U.S. 334 (1963) .......................................................................... 37

*Block v. North Dakota ex rel. Bd. of University and School Lands*,
  461 U.S. 273 (1983) .......................................................................... 18

*Bonelli Cattle Co. v. Arizona*,
  414 U.S. 313 (1973) .......................................................................... 32

*Borax Consol., Ltd. v. Los Angeles*,
  296 U.S. 10 (1935) ............................................................................ 31

*California ex. Rel. State Lands Comm'n v. United States*,
  457 U.S. 273 (1982) ..................................................................... 20, 28

*Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*,
  450 U.S. 311 (1981) .......................................................................... 28

*EEE Minerals, LLC v. State of North Dakota*,
  81 F.4th 809 (8th Cir. 2023) ............................................................. 38

*Falik v. U.S.*,
  343 F.2d 38 (2d Cir. 1965) ................................................................ 17

*Hennepin Cty. v. Fed. Nat. Mortg. Ass'n*,
  742 F.3d 818 (8th Cir. 2014) ............................................................. 13

*Iowa Tribe of Kansas and Nebraska v. Salazar*,
  607 F.3d 1225 (10th Cir. 2010) ......................................................... 16

*Joy v. St. Louis*,
  201 U.S. 332, 343 (1906) ................................................................... 29

iv

*Justice v. Valley Nat. Bank,*
    849 F.2d 1078 (8th Cir. 1988)............................................................ 20

*N.D. Bd. Univ. & Sch. Lands and N.D. Office of State Engineer v. U.S. Dep't of Interior,*
    No. 1:20-cv-185 (D.N.D.) .................................................................. 4

*North Dakota v. Jensen,*
    331 N.W.2d 42 (N.D. 1983) .............................................................. 15

*Macnamara v. Kissimmee River Valley Sportsmans' Ass'n,*
    648 So.2d 155 (Fla. Ct. App. 1994).................................................. 24

*Maysonet–Robles v. Cabrero,*
    323 F.3d 43 (1st Cir. 2003) ............................................................... 16

*Myers v. Iowa Brd. of Regents,*
    30 F.4th 705 (8th Cir. 2022).............................................................. 12

*O'Melveny & Myers v. F.D.I.C.,*
    512 U.S. 79 (1994)............................................................................. 26

*Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,*
    429 U.S. 363 (1977)................................................................... passim

*Phillips Petrol. Co. v. Mississippi,*
    484 U.S. 469 (1988)........................................................................... 28

*Rutten v. State,*
    93 N.W.2d 796 (N.D. 1958) ............................................................... 3

*Said v. Mayo Clinic,*
    44 F.4th 1142 (8th Cir. 2022)............................................................ 12

*Shively v. Bowlby,*
    152 U.S. 1 (1894).............................................................................. 24

*Sorum v. State,*
    947 N.W.2d 382 (N.D. 2020) ..................................................... 32, 38

v

*State ex rel. Sprynczynatyk v. Mills*,
    592 N.W.2d 591 (N.D. 1999) ............................................................... 3

*Stockman Bank of Montana v. AGSCO, Inc.*,
    728 N.W.2d 142 (N.D. 2007) .............................................................. 15

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,
    560 U.S. 702 (2010)............................................................................. 21

*The Wilderness Soc. v. Kane Cnty., Utah*,
    632 F.3d 1162 (10th Cir. 2011) .......................................................... 18

*United States v. Brosnan*,
    363 U.S. 237 (1960)............................................................................. 17

*United States v. Hess*,
    194 F.3d 1164 (10th Cir. 1999) .......................................................... 21

*United States v. Johansen*,
    93 F.3d 459 (8th Cir. 1996) ................................................................ 31

*United States v. Kimbell Foods, Inc.*,
    440 U.S. 715 (1979)...................................................................... 20, 25

*United States v. Oregon*,
    295 U.S. 1 (1935)................................................................................ 30

*United States ex rel. Ute Indian Tribe v. Hess*,
    348 F.3d 1237 (10th Cir. 2003) .......................................................... 34

*U.S. v. Mead Corp.*,
    533 U.S. 218 (2001)............................................................................. 38

*Wilcox v. Jackson*,
    38 U.S. 498 (1839).............................................................................. 29

*Wilson v. Omaha Indian Tribe*,
    442 U.S. 653 (1979)..................................................................... passim

*Wyoming v. United States*,
    279 F.3d 1214 (10th Cir. 2002)........................................................... 30

Appellate Case: 23-2249    Page: 6    Date Filed: 11/08/2023 Entry ID: 5334182

**U.S. Constitution**

U.S. Const. art. IV, § 3, cl. 2 .......................................................................... 29

**Federal Statutes**

28 U.S.C. § 2409a ........................................................................................ 18

28 U.S.C. § 2409a(a) .................................................................................... 19

28 U.S.C. § 2410 ..................................................................................... passim

28 U.S.C. § 2410(a) ........................................................................................ 9

28 U.S.C. § 2410(a)(5) ................................................................................. 13

43 U.S.C. § 2 ................................................................................................ 37

43 U.S.C. § 773 ............................................................................................ 37

**North Dakota Statutes**

N.D.C.C. § 35-01-04 .................................................................................... 14

N.D.C.C. § 35-37-02 .............................................................................. 14, 15

N.D.C.C. Ch. 61-33.1 ...................................................................... 4, 8, 37, 39

N.D.C.C. § 61-33.1-03 ............................................................................. 5, 38

N.D.C.C. § 61-33.1-03(2) ............................................................................ 38

N.D.C.C. § 61-33.1-03(3) ............................................................................ 38

N.D.C.C. § 61-33.1-03(3)(d) .......................................................................... 6

N.D.C.C. § 61-33.1-03(5)-(7) ...................................................................... 38

N.D.C.C. § 61-33.1-06.............................................................................. 5, 7

Appellate Case: 23-2249   Page: 7   Date Filed: 11/08/2023 Entry ID: 5334182

## Other Authorities

23 Am. Jur. 2d, Deeds § 275 (Oct. 2023 update)...........................................32

33 Am. Jur. 419, Liens § 2 (1941)..................................................................14

4 Summers Oil and Gas § 46:1 (3d ed.) (Nov. 2023 update)........................15

Black's Law Dictionary, Lien (11th ed. 2019).............................................14

viii

## I. Background

The District Court's final summary judgment order largely summarizes the relevant facts. The Federal government originally held title to the relevant lands in North Dakota under the Louisiana Purchase. When North Dakota was admitted as a State in 1889, the State acquired title to the bed of the Missouri River, up to the OHWM, under the Equal Footing doctrine. Add. 34, App. 415, R. Doc. 114 at 2.[*]

The Missouri River of the early 20th century was dynamic, prone to changing course and thereby altering the OHWM. *Id*. In order to control the river's movements and associated flooding, the Flood Control Act of 1944 authorized construction of the Garrison Dam. Add. 35, App. 416, R. Doc. 114 at 3. Construction of the dam was completed in 1953 and stopped the Missouri River's meandering in the area, fixing the OHWM's location. *Id*. The location of the OHWM just prior to the dam's completion in 1953 is the historic OHWM at issue in this case.

Construction of the Garrison Dam required impounding a large volume of water, creating what became Lake Sakakawea. *Id*. The Lake Sakakawea reservoir is large, covering over 380,000 surface acres. *See* App. 113-14, R. Doc. 82-2 at 2-3 (Army Corps of Engineers Fact Sheet) (noting it is the 3rd largest reservoir in the United States and 42nd largest reservoir in the world). Prior to constructing the dam,

---

[*] Citations to "Add." throughout this Brief refer to the addendum to the United States' opening brief; citations to "App." refer to the United States' appendix.

the U.S. needed to possess the then-upland areas that were to become inundated. Many such parcels were already in U.S. possession because the Federal government had never relinquished title to them. Those lands are referred to as the "public domain lands." Add. 36, App. 417, R. Doc. 114 at 4. Other lands the U.S. had relinquished during the preceding decades and had to re-acquire title to, which it accomplished via a combination of voluntary purchases and eminent domain. Those lands are referred to as the "acquired lands." *Id*. For the acquired lands, mineral ownership is patchwork, because for land acquired by voluntary purchase the Federal government frequently allowed private parties to retain mineral ownership; whereas for land acquired by eminent domain, the Federal government took both the surface and mineral estate. Add. 35, App. 416, R. Doc. 114 at 3. The Army Corps of Engineers surveyed the privately-held land that the U.S. needed to re-acquire prior to construction of the Garrison Dam, and those surveys depict the Corps' placement of the OHWM for the acquired lands in 1952. *Id*.[1]

For the next several decades, the precise placement of the historic OHWM separating the State-owned riverbed from the Federally-owned public domain and acquired lands—a boundary based on the Missouri River's location circa 1953— was largely an academic curiosity, at least for the lands relevant here. Add. 36, App. 417, R. Doc. 114 at 4. But that doesn't mean the State wasn't actively managing

---

[1] As the U.S. acknowledges, the 1950s Corps surveys were "administrative surveys, and not conclusive evidence of the boundaries of federal land." U.S. Br. 10 n.5.

2

State resources under the riverbed.  Since at least 1965, North Dakota has been issuing oil and gas leases for the bed of the Missouri River, determining the OHWM based on the State's analysis of water lines and vegetation from surveys, aerial photos, and State caselaw defining the OHWM.  App. 55-56, R. Doc. 38-1 at ¶¶ 4, 7; *see also State ex rel. Sprynczynatyk v. Mills*, 592 N.W.2d 591, 594 (N.D. 1999); *Rutten v. State*, 93 N.W.2d 796, 799 (N.D. 1958).  In 2007, the State's process for demarcating the OHWM became further refined when the State Engineer published the State's Ordinary High Water Mark Delineation Guidelines, with the objective of defining "a consistent and technically defensible, objective approach to delineating the OHWM." App. 338, R. Doc. 86 at ¶ 7. The Federal Bureau of Land Management ("BLM") has described the State's Guidelines as a "very detailed and well written technical guide[]."  App. 140, R. Doc. 82-6 at 45 (stating only as "error" that the State's definition of the OHWM "var[ies] from the federal definition").[2]

For most of that period, the oil and gas under or abutting the Federal lands that are the subject of this dispute was difficult to commercially develop.  *See* App. 55, R. Doc. 38-1 at ¶ 4.  But time marches on.  And technological developments for

---

[2] The State therefore disputes the statement (at U.S. Br. 33) that "[o]nly in the 2010s did the State begin to assert that the riverbed should be determined based on the application of its own definition of the OHWM."  The State had been issuing oil and gas leases for decades prior to 2010 based on its own procedures and caselaw for establishing the OHWM.  But in recent years, technological developments for oil and gas extraction brought potential conflicts between the State and Federal methods for demarcating the OHWM into focus, and both the State and the Federal government undertook efforts to establish the line more comprehensively.

3

extracting hydrocarbons—principally relating to horizontal drilling—eventually made demarcating the precise boundary of the historic OHWM a matter of heightened financial importance. Consequently, both the State and the Federal government undertook new efforts to identify the line.

On the Federal government's side, in 2013-14, the BLM published supplemental plats to draw the historic OHWM for the public domain lands circa 1953. Add. 37, App. 418, R. Doc. 114 at 5. Those supplemental plats did not reevaluate the historic OHWM for the acquired lands, as the BLM determined the 1950s Corps surveys were the best evidence of the historic OHWM for those lands. *Id*. North Dakota filed an administrative protest to some of the BLM's supplemental plats, which the Interior Board of Land Appeals rejected in March of 2020. Add. 38, App. 419, R. Doc. 114 at 6. The State is currently challenging that administrative decision. *See N.D. Bd. Univ. & Sch. Lands and N.D. Office of State Engineer v. U.S. Dep't of Interior*, No. 1:20-cv-185 (D.N.D.), Dkt. No. 1 (complaint); Dkt. No. 13 (status report summarizing that the action is stayed pending resolution of this case).

On the North Dakota side, the State Land Board commissioned a survey to demarcate the OHWM, which was completed in 2011. Add. 37, App. 418, R. Doc. 114 at 5. Implementing that survey spawned litigation, and to clarify the State's position regarding the OHWM, the State legislature enacted N.D.C.C. Ch. 61-33.1 in April of 2017. Add. 38, App. 419, R. Doc. 114 at 6. That statute distinguishes, as a matter of State law, between the public domain lands and all other lands for

4

demarcating the Missouri River's historic OHWM. For the public domain lands (that is, lands always possessed by the Federal government), State law simply points to the BLM study for demarcating the historic OHWM. Add. 39, App. 420, R. Doc. 114 at 7; *see also* N.D.C.C. § 61-33.1-06. For all other riparian lands (including the acquired lands and private lands), State law provides that the 1950s Corps surveys provide the presumptive line, subject to possible revision through the commissioning and approval of a new survey to determine the historic OHWM pursuant to State law definitions. Add. 39, App. 420, R. Doc. 114 at 7; *see also* N.D.C.C. § 61-33.1-03. Pursuant to that statute, the State commissioned the survey in 2018 (the Wenck Survey), and adopted it, with minor adjustments, as the State's demarcation of the historic OHWM for all riparian lands in the region other than the public domain lands. Add. 39-40, App. 420-21, R. Doc. 114 at 7-8.

As noted by the District Court, the Wenck Survey functionally occupies a middle ground between the State's 2011 survey (which, in some instances, drew the line higher, to the net benefit of the State) and the Federal government's supplemental plats and Corps maps (which, in some instances, draw the line lower, to the net benefit of the Federal government). Add. 40, App. 421, R. Doc. 114 at 8. Though for some tracts of riparian land along the Missouri River, the OWHMs delineated by the State and the Federal government are the same or of insignificant difference. *See* App. 138, R. Doc. 82-6 at 43 (noting there are "areas with minimal

5

differences (between the two determinations)"); App. 56, R. Doc. 38-1 at ¶ 6 (noting it is only "on some tracts" that the State and U.S. dispute the OHWM).[3]

Based on their respective definitions of the historic OHWM and associated surveys, the State and Federal governments issued oil and gas leases to Continental Resources, among other operators. For some of those leases, different placement of the historic OHWM affects whether certain mineral royalties should be paid to the Federal government or to the State. A map of the disputed tracts at issue in this action, with the U.S.'s depiction of the historic OHWM, is shown below:



App. 330, R. Doc. 82-17 at 2.

---

[3] A primary distinction between the State and Federal methods for drawing the historic OHWM pertains to the intensity of agricultural use that puts land above the OHWM. For example, whereas the Federal government generally includes land that was capable of grazing by livestock circa 1953 as above the historic OHWM, the State does not consider land that was capable of only intermittent grazing or grazing of wetland vegetation to be above the historic OHWM. *See* App. 140, R. Doc. 82-6 at 45; N.D.C.C. § 61-33.1-03(3)(d); App. 241, R. Doc. 82-12 at ¶ 3-164.

Appellate Case: 23-2249    Page: 14    Date Filed: 11/08/2023 Entry ID: 5334182

## II.   Procedural History

Continental filed this interpleader in State court in December of 2016, and the U.S. removed to Federal court.  *See* R. Doc. 1-2; R. Doc. 1.  The U.S. then moved to dismiss on the basis of sovereign immunity, which both Continental and the State[4] opposed.  *Compare* R. Doc. 32 (U.S. Br.) *with* R. Doc. 38 (State Br.) *and* R. Doc. 40 (Continental Br.).  The District Court denied the U.S.'s motion to dismiss and ordered Continental to hold the disputed royalties in escrow pending resolution of the dispute.  *See* Add. 1-14, App. 382-95, R. Doc. 49.

The State and U.S. then agreed to address the choice of law dispute in two phases: first for the public domain lands, and then for the acquired lands.

For the public domain lands, both parties agreed Federal law applies in the first instance; the dispute at that stage was whether Federal law adopts State law as the rule of decision, and, if it does, whether State law (N.D.C.C. § 61-33.1-06) violates the N.D. Constitution and public trust doctrine by deferring to the BLM supplemental plats.  *Compare* R. Doc. 81 (U.S. Brief) *with* R. Doc. 83 (State Brief). The District Court agreed with the State that Federal law should adopt State law as the rule of decision, and it agreed with the U.S. that State law defers to the BLM supplemental plats and isn't unconstitutional. Add. 15-32, App. 396-413, R. Doc. 92.

---

[4] The North Dakota Board of University and School Lands (Land Board) is the public entity charged with managing the State's oil and gas leases and is technically the party-in-interest named as Defendant-Appellee in this action.  For ease of reading, this brief will refer to the Land Board as simply the "State."

7

For the acquired lands, the parties disputed whether State law or Federal law applies either in the first instance or by adoption, and, if State law governs, whether the Wenck Survey that was commissioned and approved pursuant to N.D.C.C. Ch. 61-33.1 is the applicable State law. *Compare* R. Doc. 105 (State Brief) *with* R. Doc. 107 (U.S. Brief). The District Court agreed with the State on all points: (a) State law applies in the first instance; (b) if State law didn't apply in the first instance, Federal law would adopt State law; and (c) the Wenck Survey, as commissioned and approved pursuant to N.D.C.C. Ch. 61-33.1, is the relevant State law demarcating the historic OHWM for the acquired lands. Add. 33-47, App. 414-28, R. Doc. 114.

The U.S. filed a notice of appeal (Dkt. No. 23-2249), and the State filed a notice of cross-appeal (Dkt. No. 23-2324). But the State subsequently withdrew its cross-appeal, so the only issues to be decided on appeal are those raised by the U.S. On September 1, 2023, the U.S. filed its opening brief and simultaneously moved the Court to take judicial notice of documents it claims relate to the U.S.'s acquisition of lands in North Dakota in the 1950s. The State filed an opposition to the U.S.'s motion for judicial notice, and, on September 12, 2023, the Court directed that the motion for judicial notice would be carried forward to the merits panel.[5]

---

[5] As more thoroughly discussed in the State's opposition to judicial notice, the U.S. appears to be seeking introduction of the noticed documents to argue, either directly or by implication, that the State acquiesced to the Federal government's use of the 1950s Corps surveys for delineating the OHWM during the acquisition of the acquired lands, and principles of equitable estoppel should prevent the State from disputing their application now. But questions of estoppel are necessarily fact-

8

**I.** **The U.S. Has Waived Sovereign Immunity.** The first question to be addressed is whether the U.S. holds a "lien" on disputed mineral royalties sufficient to waive its immunity under 28 U.S.C. § 2410(a) for this interpleader. The District Court order for this question is at Add. 1-14, App. 382-95, R. Doc. 49.

**A.** **A lien does not have to be past due to be a lien.** The fundamental flaw with the U.S.'s primary argument for immunity is that it conceives of a "lien" as existing only when payment is past due. Ergo, it contends, because Continental was making timely payments at the time of the Complaint, the U.S. didn't have a "lien" on any disputed royalties at that time. But being past due is not a requirement for a "lien" to exist, either in common parlance or as a matter of North Dakota law. To have a lien is to have a security interest, and North Dakota law is clear that the U.S. had a lien for disputed mineral royalties at the time of Continental's complaint (and it has continued to ever since).

**B.** **Section 2410 is not limited to disputes about lien priority and exists alongside the Quiet Title Act.** The U.S.'s other arguments to avoid the merits are that Section 2410's waiver of immunity only applies to disputes about lien priority (as distinct from lien validity), and that Section 2410's waiver should not be given

---

intensive, and the fact that the U.S. never made that argument to the District Court—and indeed objected to the State's suggestion that discovery may be necessary in other contexts—means there have been no findings of fact as to what the State purportedly knew, or should have known, regarding how the 1950s Corps surveys' demarcation of the OHWM differs from State law for demarcating the OHWM.

9

effect in this case because it would be an "end run" around the Quiet Title Act. However, nothing in Section 2410's text suggests it is limited to disputes about lien priority and excludes disputes about lien validity. And secondly, this action is a dispute over mineral royalties, not a dispute over title to the mineral estates. Even if a quiet title action between the State and Federal government could have been an alternate way to resolve the royalty dispute, that doesn't mean a direct action over the royalty payments under Section 2410 is invalid or precluded.

**II.    For Public Domain Lands, Federal Law Adopts State Law**.  The second question is, for lands that have always been in U.S. possession, whether Federal law adopts State law as the rule of decision for demarcating the historic OHWM.  The District Court order for this question is at Add. 15-32, App. 396-413, R. Doc. 92.[6]

It is undisputed Federal law applies in the first instance for the public domain lands, yet, as the District Court held, Federal law should adopt State law as the rule of decision.  The relevant factors support adopting State law here: (1) there is no strong need for national uniformity in demarcating the intrastate OHWM on rivers;

---

[6] It is unclear whether the U.S. is, or intends to be, appealing the judgment that Federal law adopts State law as the rule of decision for the public domain lands. *Compare* U.S. Statement of Issues (filed May 25, 2023) (including issue of whether the District Court erred in concluding State law is relevant to the OHWM for land that has "always been owned by the United States") *and* U.S. Br. 39 (section header stating Federal law governs "for both the retained public domain lands and acquired lands") *with* U.S. Reply in Support of Judicial Notice (filed Sep. 18, 2023) at 2 n.1 (stating: "[a]s the prevailing party on the district court's order respecting the public domain lands, the United States has not appealed that decision").  To the extent the Court considers the question, the State defends the reasoning of the District Court.

(2) State law traditionally governs intrastate riparian property boundaries, and applying State law to the Federal lands would increase intrastate consistency; and (3) Federal interests are not being subjected to unfair treatment—especially where, as here, State law simply adopts Federal surveys for drawing the OHWM line.

**III.    For Acquired Lands, State Law Governs**. The final question is whether, for lands that the U.S. relinquished title to but later re-acquired, State law governs for demarcating the historic OHWM—either in the first instance or by adoption.  The District Court order for this question is at Add. 33-47, App. 414-28, R. Doc. 114.

**A.    State law applies in the first instance**.  Supreme Court precedent is clear that once the Federal government relinquishes title to real property, "that property, like all other property in the state, is subject to state legislation," and "state law governs subsequent dispositions."  *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co*., 429 U.S. 363, 377-78 (1977).  The U.S.'s invocation of the Property Clause is not a talisman to override that well-established principle because, contrary to the U.S.'s representation, the question of how to demarcate the OHWM in this case is not an attempt to seize property from the Federal government, but rather an attempt to establish, with clarity, what property the Federal government re-acquired to begin with.  And that is a question of State law.

**B.    Alternatively, Federal law would adopt State law**. Even if Federal law applied in the first instance, the factors that support adopting State law as the rule of decision for public domain lands also support doing so for the acquired lands.

11

**C.     State law means the State-commissioned Wenck Survey**.  Lastly, the U.S. suggests that even if State law governs for the acquired lands, it isn't bound by the survey commissioned in accordance with State law.  But the U.S. is mistaken. The Wenck Survey that was commissioned and approved by the State for demarcating the historic OHWM is just as much a part of State law as are the definitions and instructions that were enacted to implement that survey.

**ARGUMENT**

The Court reviews a district court's denial of sovereign immunity *de novo*. *See Myers v. Iowa Brd. of Regents*, 30 F.4th 705, 707 (8th Cir. 2022).  The Court also reviews a district court's grant of summary judgment *de novo*.  *See Said v. Mayo Clinic*, 44 F.4th 1142, 1147 (8th Cir. 2022).

The District Court correctly held the United States waived sovereign immunity under Section 2410 and can be interpleaded to defend its claim to the disputed mineral royalties at issue.  The District Court also correctly held State law governs how to demarcate the Missouri River's historic OHWM, both for the public domain lands (where Federal law adopts State law) and for the acquired lands (where State law applies in the first instance).  This Court should affirm.

## I.     The United States Waived Sovereign Immunity for This Action.

Under 28 U.S.C. § 2410, the United States has waived sovereign immunity for interpleader suits where the U.S. has or claims a lien on disputed property.

12

> [T]he United States may be named a party in any civil action or suit in any district court … of interpleader or in the nature of interpleader with respect to[] real or personal property on which the United States has or claims a mortgage or other lien.

28 U.S.C. § 2410(a)(5).

This lawsuit is an interpleader for disputed mineral royalties over which the United States indisputably claims an interest. By its plain text, Section 2410's waiver of sovereign immunity applies to this action. *See Hennepin Cty. v. Fed. Nat. Mortg. Ass'n*, 742 F.3d 818, 821 (8th Cir. 2014) ("[w]hen interpreting a statute, we look to its plain language"). Nonetheless, the U.S. argues it has not waived immunity because: (a) it doesn't hold a "lien" if Continental isn't past due on its royalty payments (U.S. Br. 24-28); and (b) Section 2410 only applies to disputes over lien priority, not lien validity, and giving effect to Section 2410 in this case would be an impermissible "end-run" around the Quiet Title Act (U.S. Br. 28-31). The Court should reject those arguments and affirm that Section 2410 waives the United States' sovereign immunity for this dispute.

## A. A lien does not have to be past due to be a lien.

The United States' argument that a lien must be past due to be a lien (U.S. Br. 24-28) appears premised on a misunderstanding of North Dakota law.

As the District Court recognized, North Dakota law unambiguously provides that a mineral interest owner "has a continuing security interest in and a lien on the oil or gas severed, or the proceeds of sale …, to the extent of the interest owner's interest[,] until the purchase price has been paid to the interest owner." Add. 7, App.

13

388, R. Doc. 49 at 7 (quoting N.D.C.C. § 35-37-02). A lien in favor of the mineral interest owner therefore comes into being when a mineral is severed from the estate, and the lien is extinguished when the interest owner's royalty is paid. Or, as the District Court put it: "if the United States owns minerals in North Dakota, it has a continuing state-law lien on proceeds derived from those minerals…" *Id*. That accords with the general understanding of the term, both now and when Section 2410 was enacted. *E.g.*, Black's Law Dictionary, Lien (11th ed. 2019) ("A legal right or interest that a creditor has in another's property …"); 33 Am. Jur. 419, Liens § 2 (1941) ("a charge upon property for the payment or discharge of a debt or duty … and in common parlance … used as if it embrace[s] every species of special ownership which one may have in property the general ownership of which is in another").[7]

To press its contrary argument, the United States seizes on N.D.C.C. § 35-01-04 (which provides "No lien arises by operation of law until the time at which the act secured by the lien is to be performed …") and argues the "act secured by the lien" in this case is the royalty payment. *See* U.S. Br. 26. But that's not quite right. The act secured by the lien here—*i.e.*, the action which causes the interest holder to

---

[7] Section 2410 was codified at its current location, in largely its current form, in 1948. *See* Act of June 25, 1948, ch. 646, 62 Stat. 972. That 1948 statute revised and re-codified provisions originally enacted in 1931 for liens on real property and amended in 1942 to include liens on personal property. *See* Act of March 4, 1931, ch. 515, 46 Stat. 1528; Act of Dec. 2, 1942, ch. 656, 56 Stat. 1026.

14

acquire a security interest in goods held by a third party—is the severance of the interest holder's minerals from the mineral estate.[8]  And that lien remains in place until the interest holder receives the royalty proceeds to which its entitled.  Indeed, the North Dakota case cited by the U.S. stands for that proposition.  *See Stockman Bank of Montana v. AGSCO, Inc.*, 728 N.W.2d 142, 150-51 (N.D. 2007) (holding an agricultural supplier's "lien is effective from the date the supplies are furnished," and rejecting argument the lien was "premature" because it was filed before the payment's "due date") (cited, and misinterpreted, at U.S. Br. 26).[9]

And North Dakota is far from the only State to statutorily bestow a mineral interest owner with an owner's lien on the severed minerals until they receive the royalty payment commensurate with their interest.  *See* 4 Summers Oil and Gas § 46:1 (3d ed.) (Nov. 2023 update) ("In addition to providing liens for labor and services, statutes in some oil-producing states provide for an owner's lien on the oil and gas produced from a lease, or on the proceeds of sale of the oil and gas.") (citing statutes from North Dakota, Montana, Arkansas, Oklahoma, and Texas).

The U.S. is thus in error to claim (at U.S. Br. 27-28) it couldn't have had a lien on disputed royalties at the time of Continental's complaint because it had been

---

[8] The U.S.'s reference to Section 35-37-02(1)'s prefatory clause of "To secure payment from the sale of oil and gas …" (U.S. Br. 26) mistakes the *purpose* of the lien with the *act* that creates it.

[9] The only other case cited by the U.S. in this section of its brief—*North Dakota v. Jensen*, 331 N.W.2d 42, 46 n.6 (N.D. 1983) (cited at U.S. Br. 26)—simply recites the statutory text and has no holding relevant to this case.

15

receiving timely royalty payments each following month after minerals were sold. As a matter of North Dakota law, at the time-of-filing, the U.S. held a lien on the minerals which Continental had severed, and the proceeds derived therefrom, for which the U.S. had not yet received its claimed royalty payments.

Moreover, it's not apparent that the time-of-filing ruling applies to sovereign immunity defenses. While the question doesn't yet appear to have been addressed by this Court, there is a Circuit split regarding whether the time-of-filing rule applies to sovereign immunity—like it does for standing and subject matter jurisdiction— or if instead, as the Tenth Circuit has held, "sovereign immunity is an ongoing inquiry rather than a determination to be made based on the existence of a waiver at the time of filing." *Iowa Tribe of Kansas and Nebraska v. Salazar*, 607 F.3d 1225, 1232-37 (10th Cir. 2010) (citing *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529 (1857)); *see also Maysonet–Robles v. Cabrero*, 323 F.3d 43, 49-52 (1st Cir. 2003). If the time-of-filing rule doesn't apply, it is relevant that the U.S. also has a lien for the disputed royalties Continental has been holding in escrow for years pending resolution of this dispute. *See* Add. 14, App. 395, R. Doc. 49 at 14. But the Court need not reach the time-of-filing question, as the U.S. had a lien on disputed royalties at the time of Continental's complaint as a matter of State law.

Appellate Case: 23-2249     Page: 24     Date Filed: 11/08/2023 Entry ID: 5334182

**B.    Section 2410 is not limited to disputes about lien priority and exists alongside the Quiet Title Act.**

The United States' next arguments for sovereign immunity are that even if it had a lien over disputed royalties, Section 2410's waiver should not be applied in this case because Section 2410 only applies to suits for determining "the priority or procedural validity" of liens (U.S. Br. 28-30), and that applying Section 2410's waiver in this case would impermissibly "work an end-run" on the Quiet Title Act (U.S. Br. 31).  Neither sub-part of this argument is meritorious.

 First, as the District Court observed, nothing in the text of Section 2410 suggests the waiver of immunity found therein applies only to disputes about lien priority and excludes disputes about lien validity.  Add. 9, App. 390, R. Doc. 49 at 9 ("such a limitation is contained nowhere in the statute's text").  To the contrary, the Supreme Court has recognized Section 2410 applies broadly to disputes over liens held or claimed by the U.S.  *See United States v. Brosnan*, 363 U.S. 237, 245 (1960) (United States may be named a party under Section 2410 in a suit relating to property "on which the United States claims any kind of mortgage or lien").

On appeal, the U.S. still doesn't offer any textual basis for this argument (nor does it offer any on-point caselaw); instead, it simply gestures toward decisions that have held Section 2410 can't be used to contravene "the longstanding principle" that taxpayers can't directly sue the Federal government to challenge their tax assessments.  *E.g., Falik v. U.S.*, 343 F.2d 38, 41-43 (2d Cir. 1965) (cited at U.S. Br.

17

30).  But the fact Section 2410 can't be used by every taxpayer as a short cut to challenge their tax assessments says nothing about whether, under the plain text of the statute, an oil and gas operator can bring an interpleader action when the U.S. and a state dispute the ownership of specific mineral royalties.

Second, the contention that Section 2410's waiver of sovereign immunity shouldn't be given effect because it would "work an end-run" around the Quiet Title Act (U.S. Br. 31) is, as the District Court noted, "an unreasonable position."  Add. 7, App. 388, R. Doc. 49 at 7.  On its face, this is an action to resolve disputed ownership over mineral royalties, it is not an action to quiet title for the underlying mineral estates.  The fact that the Quiet Title Act (codified at 28 U.S.C. § 2409a) could have provided an alternate way to resolve the royalty dispute does not mean that a direct action to resolve the question of royalty ownership is rendered invalid or written out of Section 2410's waiver of sovereign immunity. *See The Wilderness Soc. v. Kane Cnty., Utah*, 632 F.3d 1162, 1173 (10th Cir. 2011) (Quiet Title Act "does not, nor could it, purport to be the exclusive means of recognizing [state mining] rights.  It says nothing about a third-party forcing a QTA challenge by another with an interest in the property or disregarding the efforts of parties with an interest in the property to settle their differences.").[10]

_____

[10] The implication that the State is attempting to "evade the QTA's restrictions by artfully pleading" is inapt (*see* U.S. Br. 31 (referencing *Block v. North Dakota ex rel. Bd. of University and School Lands*, 461 U.S. 273 (1983)).  The State did not bring this action; it was interpleaded into the action just like the United States.  Moreover,

Moreover, the text of the Quiet Title Act itself disclaims any intent to restrict the type of actions capable of being brought under Section 2410.  *See* 28 U.S.C.A. § 2409a(a) ("This section does not apply to … or affect actions which may be or could have been brought under section[] … 2410 of this title …").

\* \* \*

"Because the United States claimed an interest in the minerals from which the royalties are derived, and North Dakota law provides mineral interest owners with a lien on the proceeds from oil and gas production, … Section 2410's requirements have been met."  Add. 9-10, App. 390-91, R. Doc. 49 at 9-10.  The United States' invocation of sovereign immunity should be rejected.

## II.    For the Public Domain Lands, Federal Law Adopts State Law.

It is undisputed that for the public domain lands at issue (which have always been possessed by the Federal government), Federal law controls demarcation of the OHWM in the first instance.  *See Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 670 (1979) ("where the [Federal] Government has never parted with title … [the] right to the property depends on federal law").

---

*Block* addressed whether plaintiffs could challenge Federal title by seeking a writ of ejectment or mandamus to forbid Federal officers from entering a property (*see* 461 U.S. at 280-86), it said nothing about Section 2410's waiver of sovereign immunity for lien-based claims, or that Section 2410's waiver is rendered invalid whenever a disputed lien may indirectly influence questions of real property ownership.

Appellate Case: 23-2249     Page: 27     Date Filed: 11/08/2023 Entry ID: 5334182

But "controversies governed by federal law, do not inevitably require resort to uniform federal rules. Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy dependent upon a variety of considerations always relevant to the nature of the specific governmental interests ..." *Id*. at 671 (quotation marks, ellipses, brackets, and citations omitted); *see also California ex. Rel. State Lands Comm'n v. United States*, 457 U.S. 273, 283 (1982) ("Controversies governed by federal law do not inevitably require resort to uniform federal rules. … It may be determined as a matter of choice of law that, although federal law should govern a given question, state law should be borrowed and applied … for deciding the substantive legal issue at hand.").

The Supreme Court has identified three factors to consider when assessing whether Federal law should adopt state property law as the rule of decision:

> [1] whether there is need for a nationally uniform body of law to apply in situations comparable to this,
>
> [2] whether application of state law would frustrate federal policy or functions, and
>
> [3] the impact a federal rule might have on existing relationships under state law.

*Wilson*, 442 U.S. at 672-73 (citing *United States v. Kimbell Foods, Inc*., 440 U.S. 715, 730 (1979)); *Justice v. Valley Nat. Bank*, 849 F.2d 1078, 1087 (8th Cir. 1988) (describing analysis as "a balancing test" where "[w]e first determine whether there is any significant need for uniformity on the interstate level and assess the extent to which application of state law would 'frustrate specific objectives' … [a]gainst these

20

considerations we weigh the values of intrastate uniformity …"); *see also United States v. Hess*, 194 F.3d 1164, 1173 (10th Cir. 1999) (applying the *Wilson* factors to conclude that for "construction of reservations of mineral rights in instruments effecting [Federal] land exchanges, … the content of federal law should be determined by reference to state law").  As the District Court held, those factors favor adopting State law here.  *See* Add. 28-30, App. 409-11, R. Doc. 92 at 14-16.

*Factor 1: No Need for National Uniformity*.  Defining intrastate riparian boundaries is typically the province of State law.  *See Wilson*, 442 U.S. at 675-76 ("it is for the States to establish … such rules of property as they deem expedient with respect to the navigable waters within their borders and the riparian lands adjacent to them") (citation omitted); *see also Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 707 (2010) ("Generally speaking, state law defines property interests, … including property rights in navigable waters and the lands underneath them.").  Before the District Court, the U.S. "failed to identify a need for uniform federal law in the determination of the OHWM."  Add. 29, App. 410, R. Doc. 92 at 15 ("The fact that federal rules exist for the determination of the OHWM does not identify a need for them to be applied.").

On appeal, the U.S. primarily presses two arguments for national uniformity.  First, the U.S. argues national uniformity is needed for demarcating intrastate river OHWMs to prevent the states from engaging in "gamesmanship."  U.S. Br. 47-49 (suggesting that a state, if left to its own devices, might define the OHWM as the

Appellate Case: 23-2249     Page: 29     Date Filed: 11/08/2023 Entry ID: 5334182

highest point water ever reached "plus a ten-foot buffer"). And second, the U.S. argues national uniformity is required for demarcating OHWMs because non-uniformity would create "an unnecessarily complex property/regulatory system" for determining the extent of Federal authority under its navigational servitude or other Commerce Clause powers. U.S. Br. 49. Neither of these arguments is persuasive.

First, the potential-for-gamesmanship argument is entirely misplaced here, notwithstanding any hypotheticals the U.S. may come up with. As the District Court noted, "[g]eneralized concerns of unfair treatment under state law do not trump historic interests of the States in having their own law apply to property disputes." Add. 29, App. 410, R. Doc. 92 at 15 (citing *Wilson*, 442 U.S. at 674). And the U.S. does not appear to allege the State's method for defining the historic OHWM is inherently arbitrary or irrational.[11] Indeed, for the public domain lands, it would seem especially hard for the U.S. to suggest the State is engaged in gamesmanship adverse to Federal interests, given that State law simply points back to the Federal BLM surveys.[12] And even if the State were to try engaging in the sort of

---

[11] As noted *supra*, a primary—albeit not the exclusive—difference between the Federal and State methods for demarcating the historic OHWM is whether the land was only suitable for intermittent grazing circa 1953. For some tracts, the lines drawn by the two methods are the same or of only de minimus difference.

[12] The U.S. asserts (at U.S. Br. 48) that "the State treated the acquired lands differently[] for no discernable reason other than enlargement of its own interests." The acquired lands will be further discussed *infra*, but that statement seems to invoke the adage of no good deed going unpunished. There is of course a discernable reason—other than nefarious self-aggrandizement—for the State to treat public domain lands differently from acquired lands as a matter of State law. That reason

22

gamesmanship hypothesized by the U.S., Federal court jurisdiction over any related dispute "[e]nsure[s] fair treatment of … federal interests."  *Wilson*, 442 U.S. at 673-74.  Consequently, the District Court wasn't overstating things when it said the purported fear of gamesmanship is, at least for the public domain lands, "completely unfounded."  Add. 29, App. 410, R. Doc. 92 at 15.

And second, the argument that different OHWM standards between States make it "unnecessar[ily] complex" to the identify the bounds of Federal authority is effectively the same argument rejected by the Supreme Court in *Wilson*.  *Wilson* dealt with whether to adopt State law for determining whether intrastate changes in the Missouri River were avulsive or accretive (which dictated if the boundary of Federal riparian property shifted).  *See* 442 U.S. at 673.  The Supreme Court acknowledged that adopting state law might lead to differences for how Federal riparian property lines would be drawn between states, yet it rejected "generalized pleas for uniformity," discerning "no imperative need to develop a general body of federal common law to decide cases such as this."  *Id*.  So too here.  *See* Add. 27-28, App. 408-09, R. Doc. 92 at 13-14 ("The present case and *Wilson* are very similar.").

_____

is a respect for comity within our federal system, and recognition that even if the State believes State law provides for a more accurate demarcation of the OHWM, the Federal government's line-drawing may be given a degree of deference for lands it has always possessed that it's not given for lands it re-acquired.  Regardless, for the public domain lands at issue here, any suggestion the State is engaging in gamesmanship adverse to the U.S. by deferring to Federal surveys rings hollow.

23

Therefore, just as the alleged "complexity" of having to apply different state laws in different states was insufficient to decline adopting Nebraska's law on accretions and avulsions in *Wilson*, the alleged "complexity" of having to apply different state laws in different states is insufficient to decline adopting North Dakota's law on demarcating the historic OHWM in this case—and that's particularly true for the public domain lands being discussed here, for which State law simply points back to Federal surveys.[13]

***Factor 2: Applying State Law Would Not Frustrate Federal Functions***.  On this factor, the U.S. argues that allowing State law to demarcate the historic OHWM would "create confusion" among Federal leaseholders who have acted in reliance on

---

[13] The U.S. makes the unsupported statement (at U.S. Br. 49) that "no State has ever previously adopted a definition of the OHWM that differs from the federal common law."  But the veracity of that sweeping statement is questionable.  Regardless of whether the specific definitional disagreement leading to the different surveys underlying this specific dispute exists elsewhere, it has long been recognized that States can and do have different laws governing riparian property.  *E.g., Shively v. Bowlby*, 152 U.S. 1, 18-26 (1894) (surveying State laws to conclude "each state has dealt with the lands under the tide waters within its borders according to its own views of justice and policy" and "there is no universal and uniform law upon the subject").  And courts from other states have plainly held defining the OHWM is a matter of State law, not dependent upon Federal definitions.  *E.g.*, *Macnamara v. Kissimmee River Valley Sportsmans' Ass'n*, 648 So.2d 155, 159 (Fla. Ct. App. 1994) (holding "Federal decisions have no bearing whatsoever on the legal ordinary high water boundary under Florida law," and noting "there is a very wide variety of different formulations for water boundaries from one state to another").  Indeed, even the U.S. itself appears to concede elsewhere in its brief that the dispute in *Wilson*—over how to distinguish avulsions from accretions—ultimately boils down to a State differing from Federal common law over a facet of how the OHWM should be established.  *See* U.S. Br. at 35 n.11 (citing *Wilson*, 442 U.S. at 662 n.7).

24

federal surveys and it would "make federal surveying more difficult." U.S. Br. 49-50. But this again is little more than a reformulation of the "generalized plea[] for uniformity" rejected in *Wilson*. *See* 442 U.S. at 673.

Moreover, for the public domain lands being discussed here, it's not apparent how adopting State law for demarcating the historic OHWM could cause confusion for anyone, given that State law merely points back to the Federal surveys. And for the acquired lands, discussed further *infra*, any alleged confusion about demarcating the historic OHWM for current leases should be resolved quickly and with relative clarity when the courts issue a final adjudication on which sovereign's laws should be used for demarcating the historic OHWM at issue.[14]

But more fundamentally, any time state law is incorporated as the rule of decision, it is likely going to cause some inconvenience for the Federal government. The preference of the United States would presumably always be nationally uniform laws. Yet the Supreme Court has recognized the simple fact that the U.S. may be inconvenienced by the application of different property laws in different states does not support usurping the states' traditional role over property law. *Wilson*, 442 U.S. at 673; *see also Kimbell Foods,* 440 U.S. at 733 (concluding "considerations of

---

[14] Moreover, to the extent the U.S. claims applying a State law demarcation of the historic OHWM would create "confusion" for lessees acting under Federal leases in the disputed areas, the blade cuts both ways. Applying a Federal law demarcation of the historic OHWM would cause similar "confusion" for lessees acting under State leases in the disputed area. *See* App. 335, R. Doc. 84-1 at ¶ 2 (noting the State has issued over 50 leases that include acreage in the disputed area).

25

administrative convenience do not warrant adoption of a uniform federal law”); *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 88 (1994) (“Uniformity of law might facilitate … eliminating state-by-state research and reducing uncertainty[,] but if the avoidance of those ordinary consequences qualified as an identifiable federal interest, we would be awash in ‘federal common-law’ rules.”).

     ***Factor 3: Applying Federal Law Would Disrupt State Law Relationships.*** As a general principle, **“**[p]rivate landowners rely on state real property law when purchasing real property, … [and] [t]here is considerable merit in not having the reasonable expectations of these private landowners upset by the vagaries of being located adjacent to … property in which the United States has a[n] [] interest.” *Wilson*, 442 U.S. at 674. This factor also supports adopting State law, because, as the District Court explained, doing so “would allow for land owners to be treated equally under uniform law.” Add. 29, App. 410, R. Doc. 92 at 15.

     On appeal, the U.S. argues the opposite, contending that the adoption of North Dakota law for demarcating the historic OHWM “would result in a patchwork of state and federal law.” U.S. Br. 50-51.

     But contrary to the U.S.’s suggestion, adopting State law as the rule of decision for the Federal lands at issue would lead to more—not less—consistency for demarcating the OHWM across the State. As a practical matter, the fact that State law simply defers to the Federal surveys for the public domain lands means that there will be inconsistency for the State’s historic OHWM line regardless of

26

whether Federal law is used for demarcating the line on Federal lands or whether State law is adopted as the rule of decision for those Federal lands. Though if State law is adopted, consistency across the State will be increased, and the inconsistency will be limited to only those tracts for which the U.S. has never relinquished title.

The U.S.'s argument to the contrary appears to lose sight of the fact that, outside of this dispute, there are properties riparian to the historic OHWM that are not owned by the Federal government but are instead owned by private parties. Regardless of the outcome in this case, the historic OHWM for those other tracts will continue to be drawn by State law. And if State law is adopted as the rule of decision for the Federal riparian estates, then there will be one uniform law—State law—applied for demarcating the location of the historic OHWM across the State. To be sure, the fact that State law then points to the Federal surveys for the public domain lands will, as a practical matter, result in some jagged edges. But at least demarcation of the historic OHWM will not be subject to revision any time the Federal government re-acquires title to a riparian tract. *See also* Add. 30, App. 411, R. Doc. 92 at 16 ("Should the United States ever decide to patent the land in question, state law would apply to determine the location of the OHWM.").

For that reason, adopting State law here as the rule of decision would, like in *Wilson*, alleviate at least some of "the vagaries of being located adjacent" to land in which the U.S. has an interest. *See Wilson*, 442 U.S. at 674.

*     *     *

27

Absent a compelling reason for national uniformity when it comes to demarcating the intrastate OHWM for rivers, and in accordance with the considerations laid out in *Wilson*, the Court should affirm the District Court's determination that State law applies the rule of decision to the public domain lands at issue—especially where, as here, State law simply points to Federal surveys.[15]

## III. For the Acquired Lands, State Law Governs.

### A. State law applies in the first instance.

"Under our federal system, property ownership is not governed by a general federal law, but rather by the laws of the several States." *Corvallis,* 429 U.S. at 377. And the Supreme Court has "consistently held that state law governs issues relating to [riparian] property, like other real property, unless some other principle of federal law requires a different result." *Id*.; *see also Phillips Petrol. Co. v. Mississippi*, 484 U.S. 469, 484 (1988) (as a "general proposition … the law of real property is, under our [Federal] Constitution, left to the individual States to develop and administer") (citation omitted); *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co*., 450 U.S. 311, 317 (1981) ("[p]reemption of state law by federal statute or regulation is not

---

[15] The U.S.'s gesture towards *California*, 457 U.S. at 284, to suggest other policy considerations weigh against adopting State law is unpersuasive (U.S. Br. 52 & n.14). *California* involved a federal statute expressly allocating title for the relevant dispute. *See* 457 U.S. at 284. That's not this case. Federal common law for determining the OHWM (which the U.S. contends is reflected in the BLM Manual of Surveying Instructions) does not prohibit adopting State law for demarcating the OHWM any more than federal common law for distinguishing avulsions and accretions prohibited adopting State law in *Wilson*. *See* 442 U.S. at 673.

28

favored in the absence of persuasive reasons—either that the nature of the related subject matter permits no other conclusion, or that the Congress has unmistakably so ordained") (citation and quotation marks omitted).

Accordingly, a well-established aspect of our federal system is "the rule that lands[,] once having passed from the Federal Government[,] are subject to the laws of the State in which they lie." *Corvallis,* 429 U.S. at 377 (citing *Wilcox v. Jackson*, 38 U.S. 498, 516-17 (1839) ("whenever, according to [Federal] laws, the title shall have passed, then that property, like all other property in the state, is subject to state legislation")). In other words, once the Federal government relinquishes title to a tract of land, "subsequent changes in the contour of the land, as well as subsequent transfers of the land, are governed by the state law." *Corvallis*, 429 U.S. at 377 (citing *Joy v. St. Louis*, 201 U.S. 332, 343 (1906)).

For the acquired lands at issue—which the United States indisputably relinquished title to, and then re-acquired later—State law therefore defines the land that the United States re-acquired title to. And the District Court correctly held as much. *See* Add. 45, App. 426, R. Doc. 114 at 13 ("*Corvallis* … controls the determination of whether state law or federal law applies to the acquired lands").

The U.S. resists this conclusion by arguing *Corvallis* did not involve the Federal government as a party and that the Property Clause (U.S. Const. art. IV, § 3, cl. 2) is "some other principle of federal law" that requires Federal common law to govern demarcation of the historic OHWM for the acquired lands, "*regardless of*

29

*how acquired.*" U.S. Br. 39-45 (emphasis by the U.S.).[16]   According to the U.S., its "status as the property owner on the other side of the OHWM" is all that needs be known to resolve this dispute (U.S. Br. 44)—in other words, the U.S. argues that once it acquires title to a piece of property, the Property Clause gives it the power to define (or redefine) the bounds of that acquired property however it may like.  But that can't be right, and it isn't.  "[T]he Property Clause alone does not withdraw federal land within a State from the jurisdiction of the State."  *Wyoming v. United States*, 279 F.3d 1214, 1226 (10th Cir. 2002).  And none of the cases cited by the U.S. hold that when the Federal government re-acquires title to land that has passed under state law it thereby gains the power to redefine that land's boundaries.

The U.S.'s first citation for that proposition is *United States v. Oregon*, 295 U.S. 1 (1935).  *See* U.S. Br. 42-43.  But that case is inapposite.  That case involved property over which the U.S. contended it had never passed title (*see* 295 U.S. at 6), and a dispute over what law should be applied to determine whether the Federal government intended to convey title (*see* 295 U.S. at 6-7; *see also id*. at 28 ("The construction of grants by the United States is a federal not a state question.")).  That isn't the question here.   The State does not dispute that where the Federal

---

[16] Contrary to the U.S.'s suggestion, nothing in the *Corvallis* family of cases suggest their relevant holdings turned on the fact the Federal government was not a party, and nothing suggests that when the Supreme Court said "subsequent transfers of the land[] are governed by the state law," what it meant was subsequent transfers *except* for any transfer back to the Federal government.

Appellate Case: 23-2249     Page: 38     Date Filed: 11/08/2023 Entry ID: 5334182

government has never relinquished title, Federal law applies to the property (though it may adopt State law as the rule of decision). *See supra*. Nor, for that matter, does the State dispute that when the intended scope of a Federal conveyance is disputed, Federal law may define what the Federal government intended to convey.[17] But the question presented here is different: when the Federal government acquires property, the boundaries for which have become defined by State law, does the Federal government acquire that property subject to State property law definitions? And the *Corvallis* family of cases answer that question in the affirmative.

The U.S.'s second citation for this argument is *Borax Consol., Ltd. v. Los Angeles*, 296 U.S. 10 (1935), but that case too is inapposite for largely the same reasons. The dispute in that case was, again, the extent of property the Federal government intended to convey by a federal grant. *See id.* at 22 ("The question as to the extent of this federal grant … is necessarily a federal question."). And again, the State does not dispute federal law may govern what the Federal government intended to convey in a federal land grant, but that's not the question here. Moreover, the U.S.'s invocation of *Borax* is notable because the Supreme Court itself, in *Corvallis*, recognized the *Borax* opinion is susceptible of being read too expansively

---

[17] Though when the Federal government is the party purchasing a property interest (rather than the one conveying it), "State law will generally govern the interpretation of a real property conveyance instrument, either through direct application or through the 'borrowing' principles of federal law …" *United States v. Johansen*, 93 F.3d 459, 463 (8th Cir. 1996) (applying State law for the interpretation of a wetland easement purchased by the Federal government).

Appellate Case: 23-2249     Page: 39     Date Filed: 11/08/2023 Entry ID: 5334182

for limiting the application of State law to riparian property disputes. *See Corvallis*, 429 U.S. at 369-70, 381-82 (stating the Supreme Court mistakenly applied *Borax* too expansively in *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313 (1973), and it was thereby reversing *Bonelli*'s holding that federal common law, rather than state law, applied to a migrating riverbed).

At bottom, the U.S. errs by arguing the application of State law to demarcate the historic OHWM at issue is an attempt to "retroactively take" the United States' property (U.S. Br. 42). It is not an attempt to "take" property from the Federal government; it is instead an attempt to clarify what property the Federal government re-acquired in the first place.[18] And it's black-letter law that the parties from whom the United States re-acquired title to the acquired lands could not have conveyed more than they owned. 23 Am. Jur. 2d, Deeds § 275 (Oct. 2023 update) ("No deed can operate so as to convey an interest which the grantor does not have"); *see also Sorum v. State*, 947 N.W.2d 382, 398 (N.D. 2020) (holding that other portions of the State law demarcating the historic OHWM, which had the effect of retroactively reducing the State's mineral royalties, did not violate the State Constitution's gift clause "[b]ecause the State cannot give away that which it does not own").

---

[18] It should be noted this is not a Takings case, and it was not presented to the District Court as such. It is a choice-of-law case. But if the U.S. were correct this should be viewed as a Takings case, it raises the question whether the Federal government's usurpation of the State's role for defining intrastate property with the effect of seizing State property would constitute a Federal Taking requiring just compensation.

32

As such, the *Corvallis* family of cases make clear that after the Federal government relinquished title to the acquired lands at issue (which nobody disputes it did), any interests which other parties could have held in those lands and been capable of re-transferring back to the Federal government had become determined by, and "subject to[,] the laws of the State." *Corvallis*, 429 U.S. at 377.

### B.     Alternatively, Federal law would adopt State law.

As the District Court recognized, even if the *Corvallis* family of cases does not require applying State law to the acquired lands in the first instance, the *Wilson* factors discussed *supra* for adopting State law as the rule of decision for the public domain lands would also weigh in favor of adopting State law for the acquired lands. *See* Add. 45, App. 426, R. Doc. 114 at 13.

*Factor 1: No Need for National Uniformity*.   The U.S.'s arguments that national uniformity is needed to reduce the potential for "gamesmanship" and prevent a "complex property/regulatory system" (U.S. Br. 47-49) don't fare much better for the acquired lands than they do for the public domain lands.[19]

First, as noted *supra,* generalized concerns of unfair treatment don't trump the historic interest of the States in applying their own law to intrastate property disputes, and the U.S. is not alleging North Dakota's specific method for defining

---

[19] The U.S.'s brief doesn't provide distinct arguments for challenging the adoption of State law for the public domain lands and acquired lands, and as noted *supra*, it is unclear whether the U.S. is challenging the District Court's adoption of State law as the rule of decision for the public domain lands in this appeal.

33

the historic OHWM is inherently arbitrary or irrational. Private riparian landowners are also subject to the State's demarcation of the historic OHWM, and, contrary to the U.S.'s suggestion, the electorate and the courts exist to protect against any purported impulse of the State to arbitrarily define the historic OHWM as "the highest point the water has ever reached plus a ten-foot barrier" (*see* U.S. Br. 48). The U.S.'s argument on this point expresses a base opinion of state motivations, in tension with the recognition that states can be entrusted to apply property standards "evenhandedly to particular disputes," even if in some cases that may result in a marginal decrease to Federal interests. *Wilson*, 442 U.S. at 673-74; *see also United States ex rel. Ute Indian Tribe v. Hess*, 348 F.3d 1237, 1246 (10th Cir. 2003) ("The mere fact that the United States will not prevail in the face of an otherwise neutral state rule for decision is not enough to establish that a rule is 'hostile' to the federal government's interests."). Moreover, even if the State were to try engaging in the sort of gamesmanship feared by the U.S., Federal court jurisdiction over any dispute "[e]nsure[s] fair treatment of … federal interests." *Wilson*, 442 U.S. at 673-74.

And secondly, as also noted *supra*, the argument that different OHWM standards between states makes it "unnecessar[ily] complex" to the identify the bounds of Federal authority for its navigational servitude or otherwise within each different state is effectively the same argument rejected by the Supreme Court in *Wilson*. *See* 442 U.S. at 673 (rejecting "generalized pleas for uniformity" in a

34

riparian choice-of-law dispute, and seeing "no imperative need to develop a general body of federal common law to decide cases such as this").

In short, as with the public domain lands, there is no strong need for national uniformity in demarcating the OHWM for the acquired lands.

***Factor 2: Applying State Law Would Not Frustrate Federal Functions***. The U.S.'s arguments on this factor also don't fare much better for the acquired lands than they do for the public domain lands.

The U.S. argues that allowing State law to demarcate the historic OHWM would "create confusion" among Federal leaseholders who have acted in reliance on federal surveys and "make federal surveying more difficult" (U.S. Br. 49-50). But again, this is little more than a reformulation of the "generalized plea[] for uniformity" rejected in *Wilson*. *See* 442 U.S. at 673. Furthermore, as discussed *supra*, this argument has no traction for the public domain lands (since State law points back to Federal surveys), and for the acquired lands here at issue, any alleged confusion about demarcating the historic OHWM would be resolved quickly and with relative clarity when the courts issue a final adjudication on which sovereign's laws should be used for demarcating the historic OHWM at issue.

***Factor 3: Applying Federal Law Would Disrupt State Law Relationships***. Finally, for this factor too, the U.S.'s arguments against adopting State law in the context of the acquired lands are not stronger than they are in the context of the public domain lands, and in some respects are even weaker.

35

As noted *supra*, "[p]rivate landowners rely on state real property law when purchasing real property." *Wilson,* 442 U.S. at 674. The U.S. argues that adopting State law for demarcating the historic OHWM "would result in a patchwork of state and federal law." U.S. Br. 50-51. But contrary to the U.S.'s suggestion, adopting State law as the rule of decision would lead to more—not less—consistency for demarcating the historic OHWM across the State. And this is even more so the case with the acquired lands than it is for the public domain lands.

As discussed *supra,* the U.S.'s argument to the contrary appears to lose sight of the fact that, outside of this dispute, there are properties riparian to the historic OHWM that are not owned by the Federal government but are instead owned by private parties. Regardless of the outcome in this case, the historic OHWM for those other tracts will continue to be drawn by State law. If State law is adopted as the rule of decision for the acquired lands, then there will be one uniform law applied for demarcating the historic OHWM across the State, at least with respect to all lands for which the U.S. has released its initial title. *See also* Add. 30, App. 411, R. Doc. 92 at 16 ("Should the United States ever decide to patent the land in question, state law would apply to determine the location of the OHWM.").

There are going to be some jagged lines in the OHWM across the State regardless of this Court's decision, due to the fact State law deferentially points to the Federal surveys for demarcating the historic OHWM for public domain lands. But if State law is adopted as the rule of decision for the acquired lands, those jagged

36

edges will at least be limited to only those tracts where the U.S. has always held title, and demarcation of the historic OHWM will not be subject to revision any time the Federal government re-acquires title to a riparian tract. Adopting State law would thus, like in *Wilson*, alleviate some of "the vagaries of being located adjacent" to land in which the U.S. has an interest. *See Wilson*, 442 U.S. at 674.

### C.    State law means the State-commissioned Wenck Survey.

As a final point, the U.S. argues that even if State law demarcates the historic OHWM for the acquired lands (whether in the first instance, or by adoption as the rule of decision), the Wenck Survey that was commissioned and approved pursuant to N.D.C.C. Ch. 61-33.1 isn't the applicable State law (U.S. Br. 52-54).

The U.S.'s argument here appears premised on the notion there is a distinction between the State's *substantive* law demarcating the historic OHWM and the *application* of that law. In the U.S.'s view, even if it is bound by State substantive law (which it claims is the "definition of the OHWM," U.S. Br. 52), it can't be bound by the application of that law (which it claims is the "survey process," U.S. Br. 52). The U.S. cites no caselaw in support of this argument.[20]  And it's also incorrect.

_____

[20] The only case cited by the U.S. in this section of its brief is *Best v. Humboldt Placer Min. Co*., 371 U.S. 334, 336 (1963), for the proposition that the Department of the Interior has authority to administer public lands. The U.S. also cites two statutes in this section of its brief referencing the Secretary of the Interior's authority to survey public lands. *See* U.S. Br. 53 (citing 43 U.S.C. §§ 2 and 773). But it's not apparent what relevance, if any, those authorities have for the argument that the Wenck Survey, commissioned and approved pursuant to N.D.C.C. Ch. 61-33.1, is not State law providing the State's demarcation of the historic OHWM.

37

N.D.C.C. § 61-33.1-03 not only provides the State's definition for the historic OHWM (§ 61-33.1-03(3)); it also commissioned the Wenck Survey (§ 61-33.1-03(2)); established an Industrial Commission review process for the survey, which included notice, comment, and a public hearing (§ 61-33.1-03(5)-(7)); and established, as a matter of State law, that "the industrial commission's action on each finding will determine the delineation of the ordinary high water mark" (§ 61-33.1-03(7)). Consequently, under N.D.C.C. § 61-33.1-03, the commissioned and approved Wenck Survey *is* the State law demarcating the historic OHWM. *Sorum*, 947 N.W.2d at 387 (noting the approved Wenck Survey has been "adopted as the true historical OHWM of the Missouri River"); *see also EEE Minerals, LLC v. State of North Dakota*, 81 F.4th 809, 813 (8th Cir. 2023) (noting the survey "was adopted as the State's determination of the historical ordinary high water mark under the North Dakota statute"); *accord, e.g., U.S. v. Mead Corp*., 533 U.S. 218, 226-27 (2001) (the legislature can delegate authority to enact implementing rules with the force of law).

Moreover, as the District Court explained, this is an interpleader, and the remedy is limited to resolving the competing claims for mineral royalties. Add. 46, App. 427, R. Doc. 114 at 14. The State's claim to those royalties is based on application of the Wenck Survey, whereas the U.S.'s claim to those royalties is based on application of the Federal plats and surveys. The U.S.'s argument that it can reject the Wenck Survey as an expression of State law and conduct its own surveys using

38

the State law definition of OHWM—presumably for the purpose of re-defining the State's claim to disputed royalties—is misguided, particularly given, as the District Court noted, "[t]here has been no suggestion by the United States in this interpleader action that the application of state substantive law as reflected in the Wenck Report was incorrect." *Id.*

*    *    *

Pursuant to the "rule that lands[,] once having passed from the Federal Government[,] are subject to the laws of the State in which they lie," *Corvallis*, 429 U.S. at 377, the Court should affirm the District Court's holding that State law governs demarcation of the historic OHWM for the acquired lands—which the Federal government indisputably relinquished and later re-acquired title to.  In the alternative, if Federal law applies in the first instance for the acquired lands, State law should be adopted as the rule of decision in accordance with the factors laid out in *Wilson*.  And either way, if State law demarcates the historic OHWM for the acquired lands, the Court should affirm that the Wenck Survey commissioned and approved under N.D.C.C. Ch. 61-33.1 is the State law to be used when demarcating the historic OHWM for the royalty dispute at issue in this interpleader.

<h3 align="center">CONCLUSION</h3>

The Court should affirm the judgments of the District Court.

39

Dated: November 8, 2023.

State of North Dakota
Drew H. Wrigley
Attorney General

By: /s/ *Philip Axt*
Philip Axt (ND Bar No. 09585)
Solicitor General
Email: pjaxt@nd.gov

Office of Attorney General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210

Charles Carvell (ND Bar No. 03560)
Special Assistant Attorney General
Email: cmc@pearce-durick.com

Pearce Durick PLLC
314 E. Thayer Ave., PO Box 400
Bismarck, ND 58502
Telephone: (701) 223-2890

*Counsel for Defendant-Appellee*

40

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Eighth Circuit Rule 28A(h)(2), the undersigned certifies that the following document:

NORTH DAKOTA BOARD OF UNIVERSITY AND SCHOOL OF LANDS' APPELLEE BRIEF

contains 11,355 words, was prepared in a proportionally spaced typeface using Times New Roman 14-point font, has been scanned for viruses, and is virus-free.

Dated: November 8, 2023.

/s/ *Philip Axt*
Philip Axt

41

**CERTIFICATE OF SERVICE**

The undersigned certifies that the following document:

**NORTH DAKOTA BOARD OF UNIVERSITY AND SCHOOL OF LANDS'
APPELLEE BRIEF**

was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system, that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Dated: November 8, 2023.

/s/ *Philip Axt*
Philip Axt

Appellate Case: 23-2249    Page: 50    Date Filed: 11/08/2023 Entry ID: 5334182