No. 23-2249

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

Continental Resources, Incorporated, an Oklahoma corporation,

Plaintiff – Appellee,

v.

North Dakota Board of University and School Lands,
Defendant – Appellee,

and

United States of America,
Defendant – Appellant.

Appeal from the U.S. District Court for the District of North Dakota
Case No. 1:17-cv-14-DLH-CRH (Hon. Daniel L. Hovland)

## REPLY BRIEF OF DEFENDANT-APPELLANT UNITED STATES

Todd Kim
 *Assistant Attorney General*
MARY GABRIELLE SPRAGUE
MICHELLE MELTON
 *Attorneys*
 Environment & Natural Resources Division
 Department of Justice
 P.O. Box 7415
 Washington, DC 20044
 (202) 532-3251 | michelle.melton@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

ARGUMENT.......................................................................................2

I.   Section 2410(a) does not waive sovereign immunity to this
     suit. ...................................................................................................2

     A.   The United States does not "ha[ve] or claim[]" a lien. ...................2

     B.   Section 2410(a) does not waive the United States'
          immunity to claims challenging the validity of its title
          to real property. ...................................................................................8

II.  Federal law alone governs the OHWM on the historic
     Missouri River. ..........................................................................13

     A.   State law does not govern the acquired land....................................13

     B.   Federal law does not borrow State law...........................................18

III. Even if the State law controlled, the district court erred in
     declaring the United States bound by Wenck Survey's
     boundary line. ...............................................................................24

CONCLUSION....................................................................................27

CERTIFICATE OF COMPLIANCE WITH FRAP 32 AND
       EIGHTH CIRCUIT RULE 28A

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Block v. North Dakota ex rel. Board of Univ. & School Lands*,
    461 U.S. 273 (1983) ................................................................ 10

*California ex rel. State Lands Comm'n v. U.S.*,
    457 U.S. 273 (1982) ............................................................18, 24

*Clearfield Tr. Co. v. U.S.*,
    318 U.S. 363 (1943) ................................................................ 23

*EEE Minerals, LLC v. North Dakota*,
    81 F.4th 809 (8th Cir. 2023) ................................................... 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ................................................................ 11

*Mathias v. WorldCom Tech., Inc.*,
    535 U.S. 682 (2002) ................................................................ 13

*Montanans for Multiple Use v. Barbouletos*,
    568 F.3d 225 (D.C. Cir. 2009) ................................................ 10

*North Dakota v. U.S.*,
    460 U.S. 300 (1983) ................................................................ 22

*Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel*,
    429 U.S. 363 (1977) ............................................................14, 17

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) .................................................................. 4

*Stockman Bank of Montana v. AGSCO*,
    728 N.W.2d 142 (N.D. 2007) .................................................... 7

*The Wilderness Society v. Kane Cty.*,
    632 F.3d 1162 (10th Cir. 2011) ................................................. 9

*U.S. v. Brosnan*,
363 U.S. 237 (1960) ................................................................. 9

*U.S. v. California*,
332 U.S. 19 (1947) ................................................................. 13

*U.S. v. City of New Britain, CT*,
347 U.S. 81 (1954) ................................................................. 3

*U.S. v. Kimbell Foods*,
440 U.S. 715 (1979) ................................................. 19, 20, 23, 24

*U.S. v. Little Lake Misere Land Co., Inc.*,
412 U.S. 580 (1973) ................................................. 16, 17, 19, 22

*U.S. v. Mottaz,*
476 U.S. 834 (1986) ................................................................. 10

*U.S. v. Oregon*,
295 U.S. 1 (1935) ................................................................. 15

*U.S. v. Utah*,
283 U.S. 64 (1931) ................................................................. 15

*U.S. v. Zannino*,
895 F.2d 1 (8th Cir. 1990) ......................................................... 8

*Wilkinson v. Bd. of Univ. & Sch. Lands*,
903 N.W.2d 51 (N.D. 2017) ......................................................... 15

*Wilson v. Omaha Indian Tribe*,
442 U.S. 653 (1979) ................................................. 14, 18, 19, 23

## Constitutional Provisions

U.S. Const. art. VI, cl. 2 ......................................................... 21

## Statutes

28 U.S.C. § 2409a(a) ......................................................... 10, 12

28 U.S.C. § 2410(a) ............................................... 1, 2, 8, 9, 10, 11, 12

31 U.S.C. 6901 ..................................................................... 22

43 U.S.C. § 2 ........................................................................ 25

43 U.S.C. § 1301 .................................................................. 13

N.D.C.C. § 35-01-01 ............................................................. 3

N.D.C.C. § 35-01-04 ....................................................... 2, 3, 4, 5, 7

N.D.C.C. § 35-34-08 ............................................................. 4

N.D.C.C. § 35-37-02(1) ................................................... 4, 5, 7, 8

N.D.C.C. § 61-33.1 ......................................................... 13, 26

N.D.C.C. § 61-33.1-03 ......................................................... 25

N.D.C.C. § 61-33.1-04 ......................................................... 25

Ok. Stat. T. § 52-549.3(b) ..................................................... 4

Tex. Prop. Code Ann. § 67.002(b)(1)-(2) .................................... 4

## Other Authorities

Am. Jur. 2d Interpleader § 1 ................................................ 11

**INTRODUCTION**

The district court's judgment should be reversed.

For two independent reasons, Section 2410(a) does not waive sovereign immunity to this suit. First, the United States does not "ha[ve] or claim[] a lien" within the meaning of that statute, 28 U.S.C. § 2410(a), because Continental was current on its royalty payments. Op. Br. 24-28. In arguing that a lien arises at the time of severance, Continental and North Dakota misread Chapter 35-37 and ignore other chapters of the State code governing liens. Second, as every circuit to consider the issue has held, Section 2410(a) waives immunity to adjudicate only the priority or procedural validity of liens held by the United States. Op. Br. 28-31. Appellees do not suggest that this case is about the priority or procedural validity of the two sovereigns' allegedly competing liens; it is about who owns title to real property. Continental also argues that, because *Continental* is not a claimant to real property adverse to the United States, this suit need not proceed under the Quiet Title Act ("QTA"). But the entire purpose of this interpleader suit is to compel an adverse claimant, North Dakota, to assert a title claim against the United States. Section 2410(a) does not waive the United States' immunity to that claim.

The United States is also correct on the merits. North Dakota may not retroactively redefine the OHWM. North Dakota fails to recognize—much

1

less distinguish—the numerous cases in which the Supreme Court has refused to apply State property law (either in the first instance or via incorporation) to federal land when, as here, the purpose and effect of the State's new law is to alter the United States' vested property interests.

## ARGUMENT

### I. Section 2410(a) does not waive sovereign immunity to this suit.

#### A. The United States does not "ha[ve] or claim[]" a lien.

The United States has waived its sovereign immunity in interpleader actions with respect to "real or personal property on which the United States has or claims" a lien, 28 U.S.C. § 2410(a), but there is no waiver in this case because there is no lien. Under the general provisions of North Dakota Century Code (N.D.C.C.), no lien arises by operation of law until "the act secured by the lien is to be performed." N.D.C.C. § 35-01-04. This general rule applies "to all liens . . . unless from the context relating to any of them a different intention appears." *Id.* § 35-01-01. No "different intention" appears as to oil-and-gas sales liens.

Chapter 35-37, the provision relied upon by Continental as conferring a lien, protects oil and gas operators from insolvent purchasers. *See* N.D. Legislative Branch Research Center, SB 2404, https://perma.cc/54W6-UHVG (compiled legislative history). That Chapter authorizes oil-and-gas

sales liens, identifies the property to which the sales liens attach, and explains how to perfect and enforce the liens.  But Chapter 35-37 does not specify *when* a sales lien arises by operation of law.  Accordingly, N.D.C.C. § 35-01-01 dictates that § 35-01-04 applies, meaning an oil-and-gas sales lien arises only when Continental's royalty payments are due.

Appellees assert—for different reasons—that State law confers a lien by operation of law at the time an operator severs the minerals from the land. Cont. Br. 15; ND Br. 14.  Appellees are mistaken.

Continental attempts to manufacture a conflict between Sections 35-01-04 and 35-37-02.  Br. 14-17.  It appears to argue that the latter creates an inchoate lien at the time of severance, rendering the former inapplicable.[1] Continental misreads Chapter 35-37.  Section 35-37-02(1), the provision Continental identifies as defining when the lien arises, by its terms defines the "[e]xtent of lien" ("to the extent of the interest owner's interest"), and identifies the property subject to the lien.  But it does not identify the time when a lien arises.

---

[1] A "choate" lien is a lien where the identity of the lienor, the property subject to the lien, and the amount of the lien are established.  *See, e.g.*, *U.S. v. City of New Britain, CT.*, 347 U.S. 81, 84 (1954); *Choate lien*, Black's Law Dictionary (11th ed. 2019).  Lessees pay the United States royalties based on market value, and thus, a lien's amount is unknown before sale.  Continental has not identified any sales, and therefore, if a lien exists at all, it is inchoate.

In contrast, provisions of Title 35 addressing other types of liens *do* speak to when a lien arises. For instance, a subsection of Chapter 35-34, which governs well- or pipeline-construction liens, is titled "[d]ate lien arises," and provides that such a lien "arises on the date of the furnishing of the first item of material or services or the date of performance of first labor." N.D.C.C. § 35-34-08. Similarly, general-construction liens "attach and take effect from the time the first item of material or labor is furnished upon the premises for the beginning of the improvement." *Id.* § 35-27-03.[2] As Continental acknowledges, the "usual rule" of statutory interpretation is "that 'when the legislature uses certain language in one part of the statute, and different language in another, the court assumes different meanings were intended.'" Br. 16-17 (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)). These other provisions within Title 35 demonstrate that the legislature knew how to expressly identify when a lien arises. By not doing so within Chapter 35-37, the legislature intended for Section 35-01-04's general rule to apply;

---

[2] Unlike Chapter 35-37, the laws of other States expressly dictate that an oil-and-gas sales lien arises at or before severance. Under Texas law, an oil-and-gas sales lien exists "before severance" and "continues uninterrupted and without lapse . . . after severance . . . and to all proceeds." Tex. Prop. Code Ann. § 67.002(b)(1)-(2). Oklahoma law also provides an interest owner a lien before severance: "[a]n oil and gas lien: 1. [e]xists in and attaches immediately to all oil and gas; 2. [c]ontinues uninterrupted and without lapse in all oil and gas upon and after severance; and 3. [c]ontinues uninterrupted and without lapse in and to all proceeds." Ok. Stat. T. § 52-549.3(b).

under that rule, the lien does not spring into existence until the date on which "the act secured by the lien is to be performed"—in this case, the date royalties are due.

Continental's contrary arguments are unavailing. Continental points to Section 35-37-02(1), which specifies the property to which the sales lien attaches as "the oil or gas severed, or the proceeds of sale if the oil or gas has been sold," and argues that the United States' reading of the statute nullifies the part of Section 35-37-02 giving the interest owner a lien on the "oil or gas severed." Br. 15. But this argument misunderstands that the statute provides for a lien on severed oil or gas because an obligation to pay for a sale can arise before a producer has any proceeds to which a lien attaches. For instance, an operator may sell oil to a first purchaser by contract and even deliver the oil before payment. But even if the purchaser has legal title to or possession of the oil, Section 35-37-02(1) provides that if payment is overdue and there are no proceeds, a lien attaches to severed oil and gas, rather than to proceeds that may not have (or may never) materialize. In other words, the statute confirms that, if an operator has not been paid when payment is due, the lien follows the oil and gas *or* the proceeds (if the oil and gas has been resold or consumed). It does not indicate that a lien arises at severance.

Other parts of Chapter 35-37 also support the United States' position that a lien does not arise prior to the obligation to pay. For instance, Section 35-37-02(2) explains that no lien "accrue[s] if the person holding the proceeds upon which a lien is claimed tenders to the interest owner the amount which that person in good faith believes to be due and payable." That a lien does not accrue if good-faith payment is tendered implies that no lien exists *prior* to the time payment is due. And Section 35-37-06(1) confirms that the lien follows "the oil and gas *unpaid for*," also supporting the inference that a lien arises when the obligation is due.

Moreover, Section 35-37-02(1) states that "an interest owner, *subject to section 35-37-04*, has a . . . lien on the oil or gas severed, or the proceeds of a sale if the oil or gas has been sold." N.D.C.C. § 35-37-02(1) (emphasis added). Section 35-37-04, in turn, explains that a lien is perfected only when royalties (or proceeds to another interest owner) are unpaid. Because a lien is "subject to" (i.e., conditional upon) the provisions of Section 35-37-04, a lien cannot exist prior to the moment when proceeds are both due and unpaid. Section 35-37-02(3) confirms this understanding by stating that no lien is "effective" (i.e., existing) until the statutory-notice provisions "required to be filed under section 35-37-04" have been delivered—and those notice provisions can only be completed *after* "proceeds for oil and gas which are required to be paid are

6

not paid." There is no conflict between Section 35-01-04 and Chapter 35-37. These provisions all point in the same direction: a lien arises when there is an obligation to pay.

Unlike Continental, North Dakota does not dispute that the general-lien provision applies. The State argues instead that the "act secured by the lien" referenced in Section 35-01-04 is not payment of royalties but "the severance of the interest holder's minerals from the mineral estate." ND Br. 14-15. But Section 35-37-02 expressly identifies the act secured by the lien as "payment from the sale of oil or gas," not severance. North Dakota's contrary understanding makes no sense. If "the act secured by the lien…is the severance of the interest holder's minerals from the mineral estate," as North Dakota maintains, the lien would *cease to exist at severance*, rather than, as North Dakota posits, "remain[] in place until the interest holder receives the royalty proceeds." Br. 15.

North Dakota is also mistaken that *Stockman Bank of Montana v. AGSCO,* 728 N.W.2d 142, 150-51 (N.D. 2007), supports its reading. Br. 15. The court there did not suggest that the "due date" of the obligation was irrelevant—only that the date offered by the debtor was incorrect on the facts of that case. Here, however, the parties agree that Continental must pay royalties not on the date of severance but at the end of the following month.

7

Because an oil-and-gas sales lien arises at the time the obligation secured by the lien is to be performed, and Continental was current on all of its obligations when it filed the operative complaint, the United States did not "ha[ve] or claim[]" a lien subject to Section 2410(a)'s sovereign-immunity waiver.[3]  As a result, the district court lacked jurisdiction.

**B.    Section 2410(a) does not waive the United States' immunity to claims challenging the validity of its title to real property.**

Even assuming the United States had an oil-and-gas sales lien when Continental filed the operative complaint, Section 2410(a) still would not have waived federal sovereign immunity to this interpleader action.  It waives immunity only to adjudicate the priority or procedural validity of liens held by the United States, matters which are not at issue in this suit. Op. Br. 28-31.

Appellees argue that the text of Section 2410(a) should be interpreted to permit this suit.[4]  Cont. Br. 20-23; ND Br. 17-19.  Notably, however, neither

---

[3] North Dakota also maintains that "the U.S. also has a lien for the disputed royalties Continental has been holding in escrow." Br. 16.  The State provides no argument that the United States would have a lien for royalties held in escrow, so the Court may consider the issue forfeited.  *U.S. v. Zannino*, 895 F.2d 1, 17 (8th Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argument, are deemed waived.").  Regardless, North Dakota is incorrect.  *See* Op. Br. 28 n.10.

[4] Appellees also contend that the legislative history cited by the United States is irrelevant, given that the statute was later amended.  Continental does not explain how any post-1931 amendments materially broadened the waiver of sovereign immunity beyond the stated purpose of challenging the priority of

Continental nor North Dakota cites a single decision supporting their position that Section 2410(a)'s waiver of sovereign immunity encompasses matters other than the priority or procedural validity of a lien.[5]  To the contrary, appellate courts have uniformly rejected a reading of Section 2410(a) that would authorize suits challenging matters other than the priority of liens or their procedural validity.  Op. Br. 30.  Those courts have reasoned that allowing taxpayers to use Section 2410(a) to challenge the substantive validity of a lien would create an unintended loophole that evades the Congressionally prescribed process for challenging tax assessments.

The same reasoning applies here.  Interpreting Section 2410(a) to waive sovereign immunity merely because the United States now has a lien would

liens, the purpose the Supreme Court recognized in *U.S. v. Brosnan*, 363 U.S. 237, 243-45 (1960).

[5] North Dakota cites *The Wilderness Society v. Kane Cty.*, 632 F.3d 1162 (10th Cir. 2011).  Br. 18.  That case holds only that a private entity lacked prudential standing to challenge certain actions taken by Utah, and therefore is of little relevance here.  *Id.* 1171.

Nonetheless, both the majority and dissent in *Kane County* support the United States' position that this suit is improper.  The dissent asserted that the practical effect of the court's decision was to allow U.S. title to real property to be "destroyed outside of a QTA claim," *id.* 1181, and the decision was therefore contrary to controlling Supreme Court precedent, *id.* 1184-86.  The majority rejected that characterization, noting "this court's decision in no way holds that 'the United States may be stripped of its property rights outside a QTA claim,'" and disparaged the dissent for "allow[ing] a third party (with no interest in the property) to force a quiet title action," *id.* 1173, which would "turn the QTA on its head," *id.* 1174.

similarly create a loophole that permits adverse claimants to challenge federal title to real property, notwithstanding that such challenges must be brought exclusively through the QTA.[6]

The Supreme Court has repeatedly refused to allow plaintiffs to circumvent the QTA by pleading what amount to QTA claims under other statutes. In *Block v. North Dakota ex rel. Board of Univ. & School Lands*, the Supreme Court held that North Dakota could not evade the QTA by pleading claims under the Mandamus Act, the Declaratory Judgment Act, or the APA. 461 U.S. 273, 277 (1983). In *United States v. Mottaz*, the Court barred a quiet-title suit ostensibly brought under the General Allotment Act. 476 U.S. 834, 844-47 (1986); *see also Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 228-29 (D.C. Cir. 2009) (Kavanaugh, J.) (finding claim pleaded under Federal Land Policy and Management Act actually challenged federal title and must be brought under QTA). Attempted end-runs around the QTA have uniformly failed because they upset the "carefully-crafted provisions of the [QTA] deemed necessary for the protection of the national public interest." *Block*, 461 U.S. at 285.

---

[6] The QTA "does [not] apply to … actions which may be or could have been brought under section[] … 2410," 28 U.S.C. § 2409a(a), but the fact of mutual exclusivity does not answer the question whether Section 2410(a) permits this suit. *Contra* Cont. Br. 24; ND Br. 19.

Continental's attempted end-run similarly fails. Appellees assert that this is not a QTA case because Continental, the plaintiff, is not itself an adverse claimant. Cont. Br. 4, 24-25; ND Br. 18. But their construction of Section 2410(a) would also waive federal sovereign immunity to suits where the plaintiffs *are* adverse claimants, namely, suits "in the nature of interpleader." 28 U.S.C. § 2410(a); *see* 44B Am. Jur. 2d Interpleader § 1 (2d ed. 2023) ("An action in the nature of interpleader is one in which the interpleading plaintiff asserts an interest in the subject matter of the dispute but is otherwise identical to traditional interpleader.").

In any case, Appellees' argument is misplaced. Continental points to *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) (*Patchak*). There, the Supreme Court held that an APA suit challenging the Secretary of the Interior's decision to take land into trust for an Indian tribe was not barred by the QTA because neither Patchak nor any other litigant asserted an adverse claim of title. Here, however, North Dakota—an interpleaded defendant—is an adverse claimant. By interpleading North Dakota *for the purpose of resolving its title claim* against the United States, Continental's suit by design and necessity results in the adjudication of an adverse claimant's title to the United States' property. Put differently, Continental's suit (unlike Patchak's) is not a run-of-the-mill APA suit

11

challenging agency action, with knock-on effects on U.S. title. Rather, Continental aims to compel the adverse claimants to title to "set forth with particularity the nature of the right, title, or interest which the [litigant] claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States." 28 U.S.C. § 2409a(a). This suit is an artfully pleaded QTA suit.

In sum, the QTA provides the only way an adverse claimant can judicially challenge the title of the United States to real property, and this suit involves an adverse claimant judicially challenging the United States' title to real property and must be brought, if at all, under the QTA. The Court should therefore follow the logic of *Falik* and its progeny to read Section 2410(a) as authorizing only suits challenging the priority or procedural validity of liens.

As Section 2410(a) does not waive the United States' immunity to suit, this Court should remand with instructions to dismiss for lack of jurisdiction.

## II. Federal law alone governs the OHWM on the historic Missouri River.

### A. State law does not govern the acquired land.[7]

North Dakota argues that it may redraw the boundary between the riverbed owned by North Dakota and the riparian uplands owned by the United States, asserting that "State law" applies to the acquired lands because those lands were, at one time, governed by State law. Br. 31 ("[W]hen the Federal government acquires property" it does so "subject to State law.").

The State is wrong that the United States acquires land subject to all rules of State property law. For instance, acquired federal property is not subject to State adverse possession laws. *See, e.g.*, *U.S. v. California*, 332 U.S. 19, 39-40 (1947), *superseded on other grounds by* 43 U.S.C. § 1301 *et seq.* And as the United States explained, there are good reasons why the OHWM of

---

[7] North Dakota professes confusion about the extent of the United States' appeal, ND Br. 10 n.6, 33 n.19, and its brief therefore dedicates considerable space to addressing public domain lands.

As the prevailing party with respect to the public domain lands, the United States does not challenge that part of the court's judgment. *See, e.g.*, *Mathias v. WorldCom Tech., Inc.*, 535 U.S. 682, 684 (2002) ("As a general rule, a party may not appeal from a favorable judgment simply to obtain review of findings it deems erroneous."). For this reason, and because North Dakota has dismissed its cross-appeal concerning the public domain lands, the United States' reply does not directly address North Dakota's arguments about the public domain lands. The logic of the United States' arguments, however, applies to both the public domain and the acquired lands.

navigable rivers whose beds were conveyed via the Equal Footing Doctrine is *never* determined by State law.[8] *See* Op. Br. 44-45.

But the Court need not reach the question of whether the United States takes title to acquired land subject to an existing State-law definition or delineation of the OHWM, because there is another, straightforward reason why North Dakota's OHWM does not apply:  State law cannot strip the United States of its vested property.[9]

To be sure, North Dakota disclaims that it is attempting to do so.  *See* Br. 32 (asserting that the State is not attempting to retroactively take U.S.

---

[8] No Supreme Court precedent provides that the OHWM is subject to State law.  *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel*, 429 U.S. 363 (1977) and *Wilson v. Omaha Indian Tribe*, 442 U.S. 653 (1979), dictate that, for lands no longer in federal ownership, State law determines how changes from avulsion, accretion/erosion, and reliction affect title to the beds of navigable waters and their shores and banks.  But these decisions do not permit the State to apply State law to rewrite the terms of the initial grant so that the State owns more than it originally received.  *See* Op. Br. 44-45.  North Dakota does not address this independent reason why the *Corvallis/Wilson* framework does not apply to questions involving the definition of the OHWM.

[9] The district court appeared to believe that "State law" referred to: (1) the substantive law defining the OHWM (for federal law, the definition is derived from common law; for State law, it is reflected in N.D.C.C. 61-33.1-03(3)(d) and 61-33.01.1); (2) the law governing the process for drawing the boundary line (for federal land, this process is outlined in the Manual of Surveying Instructions; State law provides for a different process in N.D.C.C. 61-33.1-03(3)); and (3) the outcome delineating the OHWM in this particular case (here, the BLM's 2013-14 plats and the Wenck Survey).

Regardless, applying the State's OHWM definition, the State's 2017 statute, or the Wenck Survey line itself are equally impermissible, as all retroactively take federal property.

property, but instead "attempt[ing] to clarify" what the U.S. acquired "in the first place."). But in the 1950s, North Dakota law was identical to federal common law. If the State's definition was *not* retroactive, the federal-law definition would apply. Alternatively, if the relevant law to apply is N.D.C.C. 61-33.1, the North Dakota Supreme Court has already held that statute is retroactive. *Wilkinson v. Bd. of Univ. & Sch. Lands*, 903 N.W.2d 51, 57-58 (N.D. 2017). This ruling is unsurprising; after every section title, the statute says "Retroactive application—see note." The note states, "this section is retroactive to the date of closure of the Pick-Sloan Missouri basin project dams."

Thus, the question is whether North Dakota may now dispossess the United States of its long-since vested property. The answer is no. As the United States has explained, Op. Br. 42-43, the Supreme Court has repeatedly rejected the notion that State law can divest the United States of its property retroactively. *See, e.g.*, *U.S. v. Utah*, 283 U.S. 64, 75 (1931) ("State laws cannot affect titles vested in the United States."); *U.S. v. Oregon*, 295 U.S. 1, 27 (1935) ("The laws of the United States alone control the disposition of title to its lands. The states are powerless to place any limitation or restriction on that control.").

North Dakota attempts to distinguish these cases on the ground that they involved only *public domain* lands, and that a different rule applies to acquired lands. ND Br. 30. But the outcome is the same regardless of the origin of U.S. title, as *U.S. v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580 (1973) (*Little Lake*), makes clear. That case addressed whether a Louisiana law, enacted after the United States acquired certain lands, applied to the federally acquired lands. The conveyance instruments (the properties had been acquired by deed and condemnation) reserved the properties' mineral rights to a private company for ten years, but specified that, after ten years, the mineral interests would revert in fee simple to the United States. After title had passed, Louisiana enacted a statute that barred the reversion of mineral rights to the United States, effectively extending the company's mineral rights indefinitely. The putative mineral interest holder claimed—as North Dakota does here—that the United States' acquired lands were subject to State law.

The appellate court sided with the company. As the Supreme Court recounted, the appellate "court's opinion seems to say that state law governs this land acquisition because at bottom, it is an 'ordinary' 'local' land transaction to which the United States happens to be a party." 412 U.S. at 590-91. The Supreme Court admonished the lower court for this reasoning, noting that the United States is no ordinary party, and ultimately concluded

16

that federal law applies in the first instance to acquisitions authorized by Congress for public purposes. *Id.* 592-93.

As in *Little Lake*, federal law governs this case. The United States acquired its interest pursuant to statutes authorizing the Garrison Dam, for the public purposes of irrigation and flood control. The federal property interest has long since vested. *Little Lake*, 412 U.S. at 596. A subsequent North Dakota law may not—in the first instance or through incorporation—disturb that interest. *Id.* 600-01 ("Our Federal Union is a complicated organism, but its legal processes cannot legitimately be simplified through the inviting expedient of special legislation which has the effect of confiscating interests of the United States.").

Nothing in *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel*, 429 U.S. 363 (1977) (*Corvallis*) is to the contrary. *Corvallis* holds that a State may, by local rule, retain lands that passed via the Equal Footing Doctrine but are no longer within the channel of a river, because land that is no longer in federal hands is generally subject to State law. But that case does not hold that the federal government acquires title subject to State OHWM law. Nor does it contemplate that the federal government may be dispossessed of its property via retroactive State law. The United States was not a party to *Corvallis*, and that decision does not address whether—much less hold that—the Federal

17

government, like private property owners, acquires property subject to State property law.  As the United States has explained, Br. 36, *Corvallis* went out of its way to indicate that its holding—that State law applied to the question of how river movement affected title—would be different if there were some federal interest at play.  429 U.S. at 371; *see also California ex rel. State Lands Comm'n v. U.S.*, 457 U.S. 273, 281 (1982) (*California*) (reiterating that federal law would apply if 'there were present some other principle of federal law requiring state law to be displaced'").  Or, put differently, "[t]he *Corvallis* rule— that state law governs—applies where the dispute over the legal effect of a shifting riverbed does not involve claims of title by a federal instrumentality." 457 U.S. at 289 (Rehnquist, J., concurring).  It has no relevance to *this* case.

### B.     Federal law does not borrow State law.

North Dakota's alternative argument that federal law borrows State law fares no better.  Whether to borrow State law is always a policy "choice dependent on a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law."  *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 672 (1979) (*Wilson*) (quoting *U.S. v. Kimbell Foods*, 440 U.S. 715, 727-28 (1979)).  Borrowing is inappropriate in this case for two independent reasons.

First, as in *Little Lake*, borrowing of State law—however defined—is foreclosed here because it "has the effect of confiscating interests of the United States." *Id.* 601. This outcome is "plainly hostile to the interests of the United States." *Id.* 597. No further analysis is necessary to reject borrowing in this case. *See* Op. Br. 46.

Second, even if the Court concludes that further inquiry is necessary, borrowing is inappropriate in this context. North Dakota relies exclusively on *Wilson*. But *Wilson* does not support borrowing here because the "specific governmental interests" and the "effects upon them of applying state law" in that case are readily distinguishable from this one. 442 U.S. at 672.

As an initial matter, there is a need for uniformity in this context. *Wilson* concerned whether State law should be borrowed to determine whether a natural change along a stretch of river should be characterized as erosion/accretion (that changes the boundary line) or avulsion (that leaves the boundary line in place). That distinction is not readily susceptible to gamesmanship by a State; sometimes a change in the river will favor the State, and other times it will favor a riparian owner. By contrast, the definition and delineation of the OHWM, which determines how far State ownership extends on either side of the centerline of the entire bed of a navigable river, is susceptible to manipulation by States. Put differently, the beneficiary of a

State rule governing the OHWM, unlike the beneficiary of rules governing natural processes, is predictable in advance, and borrowing would encourage States to redefine the OHWM to increase the area of State-owned riverbed.

North Dakota responds that its conduct is disinterested. Br. 34. The State's conduct speaks for itself. But in any event, whether the State's conduct is self-serving is also beside the point. The *Kimbell Foods* factors consider not whether a particular statute applies, but whether State law should always be borrowed in this *class* of disputes. *Wilson*, 442 U.S. at 672-73 ("[A]t this juncture we should consider whether there is a need for a nationally uniform body of law to apply *in situations comparable to this.*") (emphasis added).[10] As a class, rules about the OHWM are subject to gamesmanship. The State also argues that its interests in applying State law "trump" the United States' generalized interest in uniformity. Br. 33. But that is not the case where—as here—the State's interest is directly adverse to that of the United States.

North Dakota further diminishes the need for uniformity to avoid a complex, bifurcated system of land title and regulation. Br. 34-35. North Dakota appears to misunderstand this argument as applying to different States.

---

[10] The State's contention that its definition/delineation of the OHWM is not irrational also misses the point. Br. 34. A rule can be both self-interested/aggrandizing *and* rational, as demonstrated by the State's now-abandoned argument that it owns the whole bed of Lake Sakakawea. Op. Br. 13.

Br. 34.  But as the United States explained, Op. Br. 49, incorporating State law would mean that a federal rule would determine the OHWM for navigational servitude purposes, but a State rule would determine the OHWM for property boundary purposes—on the *same* waterbody.[11]  In other words, there would be two boundaries (one serving each purpose) on a single navigable river.  This situation, too, was not contemplated by *Wilson*; borrowing a State-law classification of natural changes does not mean that the boundary of the federal navigational servitude is separated from the boundary of the riparian parcels.  Such a system would be complex, requiring federal agencies to maintain two sets of maps with different OHWMs, and unnecessary, because a uniform federal rule, defined by neutral rules that have long been enshrined in the common law, in no way undermines the usual constitutional balance between state and federal laws.  *See* U.S. Const. art. VI, cl. 2.

North Dakota also summarily asserts that borrowing State law would not adversely affect the administration of federal programs once this lawsuit is resolved.[12]  ND Br. 35.  But, as the United States has explained, borrowing

---

[11]  North Dakota does not suggest that State law may redefine the extent of the United States' Commerce Clause authority, and any such argument would be meritless.

[12]  The State implicitly concedes the United States has incurred harms from the judgment, but suggests that these harms are irrelevant as they "would be resolved quickly and with relative clarity once the courts issue a final

State law *would* upset the government's need for certainty and finality of title for purposes of administering federal programs. Op. Br. 50; *see also Little Lake*, 412 U.S. at 597 ("Certainty and finality are indispensable in any land transaction, but they are especially critical when, as here, the federal officials carrying out the mandate of Congress irrevocably commit scarce funds."); *cf. North Dakota v. U.S.*, 460 U.S. 300, 320 (1983) (North Dakota law purporting to automatically terminate U.S. acquired property interests after 99 years did not ensure certainty and finality in land transactions).

If the State prevails on the borrowing of State law, the federal government likely would need to update its official maps for all federal interest lands that abut navigable waters in North Dakota, and changes to the official maps would trigger the need for federal agencies to change the programs that rely on those maps' boundaries. For instance, in addition to mineral leasing, payments to counties "in lieu of taxes," 31 U.S.C. 6901 *et seq.*, grazing permits, and lands and realty rentals are all keyed to official federal surveys.

This immense administrative undertaking would, at a minimum, take several years to complete and require an enormous outlay of personnel resources to update maps, adjust leases, permits, and payment programs, and

---

adjudication." ND Br. 35. The State is incorrect. As North Dakota elsewhere admits, ND Br. 38, a final adjudication in this interpleader action would not resolve the sovereigns' dispute over the lands not leased by Continental.

make any necessary refunds.  But this resource investment is not necessarily a one-time problem.  If federal law borrows State law, the State would be in control of whether, and when, this administrative process must happen again, because the State could, *at any time*, again alter the OHWM (of particular note, North Dakota has, in the last decade, changed positions about the location of the OHWM three times).  In other words, the application of State law "would subject the rights and duties of the United States to exceptional uncertainty." *Clearfield Tr. Co. v. U.S.*, 318 U.S. 363, 367 (1943).  The upheaval itself—as well as the lingering uncertainty that further upheaval could be triggered at any time—counsels against the borrowing of State law.

Further, the third *Kimbell Foods* factor—the effect of borrowing a State rule on existing property relationships, *Wilson*, 442 U.S. at 673—also favors the application of uniform federal law.  Op. Br. 51.  The State's counterargument boils down to the contention that borrowing State law will ultimately lead to greater consistency *within* North Dakota.  *Id.* 36-37.  Even assuming the State is correct in this regard (it is not), this factor focuses on how applying federal law would affect *existing* property owners' interests.  The State does not rebut the United States' point that borrowing State law in this context has undeniably upset the status quo relied upon by private property owners.  *See*, *e.g.*, *EEE Minerals, LLC v. North Dakota*, 81 F.4th 809 (8th Cir. 2023).

Finally—and also counseling in favor of the exclusivity of Federal law here—there is already a well-developed federal law on this subject. *See, e.g.*, *California*, 457 U.S. at 284. Although North Dakota denies the relevance of *California* because that case involved a federal statute, Br. 28 n.15, the Court's decision did not rest exclusively on the presence of the statute. The Court there—as it has elsewhere—found it relevant that there was a long-settled body of law governing the issue there, and that factor supports the application of federal law in this context as well. *See, e.g.*, *California*, 457 U.S. at 284; *accord Kimbell Foods*, 440 U.S. at 739 (declining to adopt a new rule where there was already a "well-established" and "readymade" body of law that has "proven workable over time").

For at least these reasons, federal law does not borrow State law.

## III. Even if the State law controlled, the district court erred in declaring the United States bound by Wenck Survey's boundary line.

For the reasons explained in the Opening Brief and above, North Dakota may not enact laws that retroactively take federal property. But, even if "State law" could be borrowed, the Wenck Survey itself is preempted by federal law.

North Dakota contends that the Wenck Survey *is* the "State law" that applies. Br. 37-38. To be sure, the Wenck Survey was mandated by State law. And the results of that survey may be conclusive for purposes of State law. *See,*

*e.g.*, N.D.C.C. 61-33.1-04 (explaining how the act will be implemented as to the administration of State interests). Accordingly, if federal law does not control, the State may enforce the Wenck Survey for purposes of administering the State's own programs, as it has been doing to date.

But nothing in North Dakota's 2017 statute purports to require the federal government to recognize the Wenck Survey in administering *federal* programs. Nor could the State legislature have dictated the adoption of the Wenck Survey for that purpose. As explained, Op. Br. 52-54, Congress has already decided that only the Department of Interior may officially delineate the official boundaries of federal land for the purposes of administering federal programs. Accordingly, had the State legislature intended for the Wenck Survey to be used to determine the boundaries of federal land, such a requirement would have been preempted by 43 U.S.C. § 2. Of course, if the State wishes to challenge the U.S. *delineation* of the boundary after incorporating State law, it could either challenge the adoption of the U.S. survey as arbitrary and capricious pursuant to the Administrative Procedure Act or bring a timely QTA suit. But requiring the federal government to be bound by the Wenck Survey for the purpose of administering Continental's leases conflicts with Congress' delegation of survey authority to Interior.

North Dakota also maintains that the United States may be bound by the survey of a different sovereign in this interpleader action because the United States' "claim" here is based on the parties' respective survey lines. ND Br. 38. That is incorrect. The United States' claim is based on its *ownership*, which turns on the location of the OHWM. In the event of a dispute between two competing survey lines applying the correct law, the court would need to determine the correct location of the boundary by hearing factual evidence. In other words, a court in a proper QTA suit (unlike this one) may make a boundary determination that binds the United States after hearing evidence to determine the correct location of the boundary line under governing law.

But here, the district court did not engage in such factfinding. It simply asserted that, as a legal conclusion, the United States must recognize North Dakota's boundary determination based on the court's (incorrect) determination that all State law is binding on the United States. Even if the court were correct that State law is relevant to the OHWM determination (which it is not, *see* Part II, *supra*), it would not follow that the Wenck Survey controls the OHWM boundary line.

## CONCLUSION

The Court should vacate the district court's judgment and remand with instructions to dismiss.  If the Court reaches the merits, it should reverse.

Respectfully submitted,

/s/ Michelle Melton

TODD KIM
*Assistant Attorney General*

MARY GABRIELLE SPRAGUE
MICHELLE MELTON
*Attorneys*
U.S. Department of Justice
Environment & Natural Resources Division

January 9, 2024
90-1-18-14894

## CERTIFICATE OF COMPLIANCE WITH FRAP 32 AND EIGHTH CIRCUIT RULE 28A

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Calisto MT font.

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding portions of the brief exempted by Fed. R. App. P. 32(f) and 8th Cir. R. 32A(c), it contains 6,464 words.

I further certify that, incompliance with 8th Cir. R. 28A(h), the electronic version of this brief has been scanned for viruses and is virus-free.

/s/ Michelle Melton
Counsel for Appellant

January 9, 2024

## CERTIFICATE OF SERVICE

I certify that on January 9, 2024, I electronically filed this reply brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Michelle Melton
Counsel for Appellant